## JOHN LUSSEM

*v.*

## THE SANITARY DISTRICT OF CHICAGO.

*Opinion filed October 24, 1901.*

1. SANITARY DISTRICTS—*when ordinance sufficiently specifies purposes for which proceeds from bonds are to be used.* Under section 9 of the Sanitary Drainage act, providing that districts "may borrow money for corporate purposes and may issue bonds therefor," an ordinance adopted by the Sanitary District of Chicago which provides for an issue of bonds the proceeds of which shall be used for "corporate purposes" is sufficiently definite in that respect.

2. SAME—*Sanitary District of Chicago may deepen and widen Chicago river.* The Sanitary District of Chicago has power, with the consent of the Federal government and upon payment of such damages as it may cause, to widen and deepen the Chicago river so that the same shall have sufficient capacity to supply the drainage canal with enough water to enable the district to comply with the statute regulating the flow of water without violating the restrictions contained in the permit issued by the Secretary of War to turn the water into the canal.

3. SAME—*sanitary district may build new bridges across the Chicago river.* If the necessary changes to be made in the Chicago river by the sanitary district will render any existing bridge or bridges unfit for use, the district has power to re-place such bridges with new ones of proper construction.

4. SAME—*eleventh issue of bonds is within the debt limit.* The eleventh issue of bonds by the Sanitary District of Chicago in the amount of $2,750,000 is within the amount which the district is authorized by law to raise, both as regards the percentage of indebtedness and the $15,000,000 limit imposed by sections 9, 10 and 12 of the Sanitary Drainage act of 1889.

5. SAME—*equalized assessment for preceding year is proper basis for estimating legal limit of indebtedness.* Whether or not the amount of the bond issue of the sanitary district of the date of October 22, 1900, is within the legal limit imposed by statute upon the right of the sanitary district to incur indebtedness, is to be ascertained by computation, based upon the equalized assessed valuation of the property within the district for the year 1899.

6. PARTIES—*purchaser of bonds is necessary party to bill to cancel the sale and avoid the bonds.* The purchaser of bonds issued by a corporation is a necessary party to a bill to have the bonds declared invalid and the sale thereof fraudulent and collusive.

MAGRUDER, J., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. CHARLES G. NEELY, Judge, presiding.

WOOD & OAKLEY, for appellant:

The right of a tax-payer to control and to keep within legitimate channels the municipal funds to which he is bound to contribute is unquestioned. Consequently, he has the right to invoke the aid of a court of chancery to restrain the mis-use of public funds or the issuance, wrongfully, of municipal bonds. *Springfield* v. *Edwards*, 84 Ill. 626.

Sanitary districts being corporations of a *quasi* municipal character and erected to perform one single function, can exercise no powers except those expressly granted. In this respect they differ from municipal corporations, properly so called, particularly in tax matters. Dillon on Mun. Corp. secs. 89, 91.

The first duty of the sanitary district is to perform the corporate functions for which it was created, and hence it cannot pledge or mortgage its income to such an extent as to impair its ability to perform this first duty. *White* v. *Mayor of Decatur*, 23 So. Rep. 999.

The bonds are made void by the failure of the district to make provision for a tax with which to pay interest for the year 1900, in violation of the constitution of Illinois, (art. 9, sec. 12,) and of section 10 of the Drainage act. *Kyes* v. *St. Croix County*, 83 N. W. Rep. 637.

The fact that since the bill was filed the bonds, the issuance of which the bill sought to restrain, have been put out either in good or in bad faith, does not impair the right of complainant (if his contention be well founded) to the writ of injunction, for the reason that defendant acted at its peril, as did all purchasers. *Holden* v. *Alton*, 179 Ill. 318; *Lambert* v. *Alcorn*, 144 id. 313; *Moundsville* v. *Ohio River Co.* 20 L. R. A. 161; *Hunt* v. *Sain*, 181 Ill. 372; *Harrison* v. *Supervisors*, 51 Wis. 647; *Snyder* v. *Railway Co.* 41 L. R. A. 345; *Central Trust Co.* v. *Moran*, 29 id. 212; High

on Injunctions, (2d ed.) sec. 758; *Willamette Iron Works* v. *Oregon Railway Co.* 29 L. R. A. 88.

James Todd, and P. C. Haley, for appellee:

If a party by his own act interferes with a safe and convenient route and creates a necessity for a bridge, he must, upon principle, be held to supply that necessity. *Dygert* v. *Schenk*, 23 Wend. 445; *Phœnixville* v. *Iron Co.* 45 Pa. 135; *Ammerman* v. *Canal Co.* 40 Pa. St. 256; *Township of Newland* v. *Davis*, 77 id. 317; *Lowell* v. *Proprietors of Locks*, 104 Mass. 181; *Evansville* v. *Decker*, 84 Ind. 325; Elliott on Roads and Streets, sec. 22; *State* v. *Madison*, 59 Me. 538.

It is to be inferred that when the legislature of the State authorizes a county or city to contract a debt by bond, it intends to authorize it to levy such taxes as are necessary to pay the debt, unless there is in the act itself, or in some general statute, a limitation upon the power of taxation which repels such inference. *Loan Ass.* v. *Topeka*, 20 Wall. 655.

When authority to borrow money or incur an obligation in order to execute a public work is conferred upon a municipal corporation, the power to levy a tax for its payment or discharge of the obligation accompanies it,— and this, too, without special mention that such power is created. *Quincy* v. *Jackson*, 113 U. S. 332; *United States* v. *New Orleans*, 98 id. 381; *East St. Louis* v. *Amy*, 120 id. 600.

The equalized assessed valuation of the property within the sanitary district of Chicago for the year 1899 alone determined the amount to which the district might become indebted. *Culbertson* v. *Fulton*, 127 Ill. 30; Simonton on Mun. Bonds, sec. 137.

Statutes must be interpreted according to their intent and meaning, and not always according to the letter. A thing within the intention is within the statute though not within the letter, and a thing within the letter is not within the statute unless within the intention. *Perry* v. *Skinner*, 2 M. & W. 471.

Mr. JUSTICE HAND delivered the opinion of the court:

The original bill of complaint in this case was filed in the circuit court of Cook county by the appellant, against the appellee, for an injunction restraining the appellee from issuing its bonds to the amount of $2,500,000, bearing date October 1, 1900, as provided for by the following ordinance, adopted by the board of trustees of appellee on the 12th day of September, 1900:

"*Be it ordained by the board of trustees of the Sanitary District of Chicago:*

"Section 1. That there be borrowed the sum of two million five hundred thousand (2,500,000) dollars for the corporate purposes of the Sanitary District of Chicago, and that interest-bearing coupon bonds be issued therefor to the amount of two million five hundred thousand (2,500,000) dollars by said Sanitary District of Chicago, said bonds to be of the denominations of one thousand (1000) dollars each, all to bear date the first day of October, 1900; one hundred and twenty-five thousand (125,000) dollars of the principal of said bonds to be payable on the first day of October, 1901, and each of the years thereafter following, until and including the year 1920; said bonds to be numbered consecutively from sixteen thousand and ninety-one (16,091) to eighteen thousand five hundred and ninety (18,590) inclusive, and to bear interest at the rate of four (4) per centum per annum from the date thereof; interest to be payable on the first day of April and of October of each year, and to be evidenced by coupons attached to each bond, to be numbered consecutively, each coupon to bear the number of the bond to which it is attached and to be for the sum of twenty (20) dollars, and the first or number one (1) coupon of each bond to be payable on the first day of April, 1901, and the next or number two (2) coupon on each bond to be payable on the first day of October, 1901, and so on, each succeeding coupon being payable six (6) months after the preceding one, both principal and interest to

be payable at the office of the treasurer of the Sanitary District of Chicago, interest to be payable only upon the presentation and surrender of the proper interest coupons. Such bonds shall be signed on behalf of the Sanitary District of Chicago by the president of the board of trustees and countersigned by the clerk of the Sanitary District of Chicago, and attested by the seal of said sanitary district.

"Sec. 2. That said bonds, when they are executed, shall be deposited with the clerk of the district for safe keeping, and shall be sold for such price and for such rates as the board of trustees of this district shall from time to time determine and direct, and the proceeds arising from the sale of said bonds shall be received by the treasurer of said district as such, and shall be used for the corporate purposes thereof, as may be directed from time to time by the board of trustees.

"Sec. 3. That in each of the hereinafter mentioned years there shall be, and hereby is, levied and assessed on the taxable property within said district, the sums, respectively, as follows: For the year 1900, two hundred and twenty-five thousand (225,000) dollars; for the year 1901, two hundred and twenty thousand (220,000) dollars; for the year 1902, two hundred and fifteen thousand (215,000) dollars; for the year 1903, two hundred and ten thousand (210,000) dollars; for the year 1904, two hundred and five thousand (205,000) dollars; for the year 1905, two hundred thousand (200,000) dollars; for the year 1906, one hundred and ninety-five thousand (195,000) dollars; for the year 1907, one hundred and ninety thousand (190,000) dollars; for the year 1908, one hundred and eighty-five thousand (185,000) dollars; for the year 1909, one hundred and eighty thousand (180,000) dollars; for the year 1910, one hundred and seventy-five thousand (175,000) dollars; for the year 1911, one hundred and seventy thousand (170,000) dollars; for the year 1912, one hundred and sixty-five thousand (165,000) dollars; for

the year 1913, one hundred and sixty thousand (160,000) dollars; for the year 1914, one hundred and fifty-five thousand (155,000) dollars; for the year 1915, one hundred and fifty thousand (150,000) dollars; for the year 1916, one hundred and forty-five thousand (145,000) dollars; for the year 1917, one hundred and forty thousand (140,000) dollars; for the year 1918, one hundred and thirty-five thousand (135,000) dollars; for the year 1919, one hundred and thirty thousand (130,000) dollars,—for the purpose of paying the principal and interest of the bonds issued under this ordinance, said sums so levied being sufficient to pay the interest on said bonds as it falls due, and also to pay and discharge the principal thereof as the same shall fall due; and the clerk of this district is hereby directed in the year 1900, and in each of the years thereafter, until and including the year 1919, to include the amount required by this ordinance to be raised by taxes in each of said years, respectively, in the amount which shall be certified to by the county clerk in each of said years as the amount required to be raised by taxation in said district.

"Sec. 4. Bonds, to be issued in pursuance of this ordinance, may he registered with the treasurer of said district, and after such registry no transfer shall be valid except upon the books of said treasurer, but the registry thereafter upon the books of the treasurer of a transfer to bearer shall restore transferability by delivery; said bonds shall continue subject to successive registrations and transfers to bearer, as aforesaid, at the option of the holder.

"Sec. 5. That the credit and resources of the Sanitary District of Chicago be and the same are hereby irrevocably pledged to the payment of the bonds which shall be issued in pursuance of this ordinance, and the interest thereon as it shall fall due.

"Sec. 6. This ordinance shall take effect and be in force from and after its passage."

Appellee interposed a demurrer to said bill, which was confessed by appellant, who on the 18th day of October filed an amended bill of complaint.

On the 22d day of October, as an amendment to the ordinance of September 12, the board of trustees of appellee adopted the following ordinance:

"*Be it ordained by the board of trustees of the Sanitary District of Chicago:*

"Section 1. That one hundred and twenty-five (125) of the bonds authorized to be issued by the ordinance passed September 12, 1900, numbered from sixteen thousand and ninety-one (16,091) to sixteen thousand two hundred and fifteen (16,215), and falling due October 1, 1901; be and the same are hereby ordered canceled and destroyed without being issued, and that the tax of two hundred and twenty-five thousand (225,000) dollars levied and assessed upon the taxable property of the Sanitary District of Chicago for the year 1900 by section 3 of said ordinance be and the same is hereby canceled and annulled; and that the amount of the tax levied and assessed upon the taxable property of the Sanitary District of Chicago for each of the years trom 1901 to 1919, inclusive, by section 3 of said ordinance, be and the same is hereby increased in the sum of five thousand dollars ($5000.)

"Sec. 2. That said ordinance of September 12, 1900, be and the same is hereby in all respects ratified and confirmed.

"Sec. 3. That an ordinance of this board passed October 1, 1900, appropriating the proceeds of the bonds authorized under said ordinance passed September 12, 1900, to certain specified purposes, be and the same is hereby repealed.

"Sec. 4. That the proceeds of the bonds issued under said ordinance of September 12, 1900, shall be held in the treasury of the district until expended and paid out for the corporate purposes of the district, under the direction of this board."

On the same day, $2,375,000 in amount of the bonds provided for in said ordinance as amended were issued, sold and delivered to the Illinois Trust and Savings Bank by virtue of the following ordinance adopted on said day by the board of trustees of appellee, awarding said bonds to said bank upon its bid:

"*Be it ordained by the board of trustees of the Sanitary District of Chicago:*

"Section 1. That the action of the board of trustees of the Sanitary District of Chicago of October 3, 1900, in awarding to the New York Security and Trust Company the bonds of the sanitary district of $2,500,000 at four per cent interest, (the same being the eleventh issue of bonds of said Sanitary District of Chicago,) be and the same is hereby repealed and rescinded.

"Sec. 2. That the sum of $76,000 received by the sanitary district from the said the New York Security and Trust Company by certified checks accompanying the bids for said bonds be and the same is hereby refunded to the New York Security and Trust Company, and that the president and clerk be directed to draw their warrant for the re-payment of said sum.

"Sec. 3. That the eleventh issue of bonds of the sanitary district, to the extent of $2,375,000, be and the same is hereby awarded to the Illinois Trust and Savings Bank on their bid this day received by the committee on finance, at par, accrued interest, and the premium of $2500.

"Sec. 4. That this ordinance shall take effect and be in force from and after its passage."

Whereupon appellant, on the 17th day of November, 1900, filed an amended and supplemental bill praying that the issue and sale of said bonds be set aside, or if the bonds were issued and sold beyond re-call, then that the proceeds derived from the sale thereof be charged with the trust of redeeming the same, and for that pur-

pose paid into court or into some suitable depository. The appellee, on the 26th day of October, 1900, having filed its answer to said amended bill, the same was ordered by the court to stand as an answer to said amended and supplemental bill, and the appellant having filed a replication thereto, the cause was heard by the court upon the amended and supplemental bill, the answer of appellee and the replication thereto, and proofs, both oral and documentary, submitted in open court, and a decree entered dismissing the bill for want of equity, from which decree this appeal is prosecuted.

It is first contended by appellant that said bonds are void by reason of the fact that the ordinances authorizing the issue thereof do not sufficiently state the purposes for which the funds to be derived from the sale thereof are to be used. It is provided in said ordinances that the proceeds arising from the sale of said bonds shall be used for the "corporate purposes" of said district, as may be directed from time to time by its board of trustees. Section 9 of the Sanitary Drainage act (Hurd's Stat. 1899, p. 329,) provides that districts organized under said act "may borrow money for corporate purposes and may issue bonds therefor." The ordinance authorizing the issue of said bonds specifies the purposes for which the proceeds thereof are to be used, as "corporate purposes," which is the language of the statute specifying the purposes for which sanitary districts organized under said act may borrow money and issue bonds. In *Wilson* v. *Board of Trustees*, 133 Ill. 443, we held valid an ordinance passed by the appellee authorizing its first issue of bonds, wherein the purposes for which the proceeds thereof were to be used were stated to be "corporate purposes." We are of the opinion the ordinance in the particular complained of is sufficiently definite, and that the statement therein that the proceeds arising from the sale of said bonds are to be used for "corporate purposes" is a sufficient statement of the purposes for which

the proceeds arising from the sale of said bonds are to be used.

It is charged by appellant in his bill of complaint that the appellee proposes to use the proceeds arising from the sale of said bonds for the purpose of deepening, widening, bridging and otherwise improving the Chicago river between Lake Michigan and the point on the south branch of said river where the main artificial channel constructed by appellee as an outlet for said district connects with the south branch of said river, and avers that said purpose is not a corporate purpose of appellee, and that said bonds cannot be lawfully issued or the funds derived from the sale thereof used for such purpose. In reply thereto it is averred in the answer of the appellee "that, if it lawfully may, it proposes to use a portion of the money raised by the issue of said bonds in the deepening and widening of the Chicago river, as aforesaid, the payment of owners of property along the bank of said river where the same is by this defendant obtained from said property owners for the purpose of widening said river, and in the construction of necessary bridges across said river where the works of this defendant may make it necessary to construct such new bridges."

The Sanitary District of Chicago was organized in the year 1890 under an act entitled "An act to create sanitary districts and to remove obstructions in the Desplaines and Illinois rivers," approved May 29, 1889, in force July 1, 1889, (Hurd's Stat. 1899, p. 327,) and herein designated as the "Sanitary Drainage act." It shortly thereafter commenced to secure right of way for the construction of its main channel, and in the year 1892 the work of construction on the main channel commenced, which channel was substantially completed in January, 1900. Its main artificial channel begins at Robey street, in the city of Chicago, at its intersection with the south branch of the Chicago river, and is divided into three sections, the first section extending from Robey street to Summit, a dis-

tance of 7.8 miles; the second, from Summit to Willow Springs, a distance of 5.3 miles; and the third, from Willow Springs to the controlling works at Lockport, a distance of 15.95 miles. The boundaries of said district include all of the city of Chicago except that part lying south of Eighty-seventh street, and all the territory embraced in the incorporated town of Cicero and in the incorporated village of Lyons, and also a portion of the territory of the township of Lyons. The cost of the construction of said main channel, together with the works from Lockport to and through the city of Joliet and the diversion of the Desplaines river, made necessary in order to complete the main channel, has amounted to approximately $35,000,000. The purposes sought to be accomplished by said act and the formation of the Sanitary District of Chicago are well stated by Mr. Justice BAILEY in the case of *People* v. *Nelson*, 133 Ill. 565. On page 580 of the opinion written by him in that case he says:

"The general sanitary scheme adopted by the act consists of creating certain districts comprising certain areas of contiguous territory, and empowering such districts to construct and maintain a common outlet for the drainage and sewage of their respective territories. That scheme is indicated in the first section of the act, as follows: 'That whenever any area of contiguous territory within the limits of a single county shall contain two or more incorporated cities, towns or villages, and shall be so situated that the maintenance of a common outlet for the drainage thereof will conduce to the preservation of the public health, the same may be incorporated as a sanitary district under this act.' * * * As a historical fact, and as a fact abundantly shown by the terms of the act itself, this scheme was formulated mainly, if not exclusively, with reference to the sanitary condition and needs of the city of Chicago and its environs, and we can not give proper construction to the act without taking

into account the peculiar situation of the territory which the proposed Sanitary District of Chicago was intended to embrace. Chicago is a city of probably one million inhabitants or more, and is bordered on the east by Lake Michigan, that lake being the source of its water supply. A few miles west of Chicago, and running in a north and south direction, is the Desplaines river, and at a point opposite the southerly part of the city said river turns toward the south-west and runs in that direction to the city of Joliet, below which it is known as the Illinois river. The territory between Lake Michigan and the Desplaines river and along the course of that river to Joliet is nearly level, none of it being more than a few feet above the level of the lake, while at Joliet the general surface is quite a number of feet below the level of the lake. The object of the system of drainage proposed by said act is, to prevent the drainage and sewage of the city and its environs being carried into Lake Michigan, thereby contaminating the waters of the lake. This result is to be reached by cutting a channel which will give an outlet for the drainage and sewage of the city in the direction of the Desplaines and Illinois rivers, and which will also cause a large flow of water from the lake through the proposed artificial channel into those rivers, for the purpose of diluting the sewage and rendering it innocuous to the people living along the course of those streams."

The corporate authorities of sanitary districts organized under said act consist of a board of trustees, composed of nine members. Sections 20, 23 and 27 of said act are as follows:

"Sec. 20. Any channel or outlet constructed under the provisions of this act which shall cause the discharge of sewage into or through any river or stream of water beyond or without the limits of the district constructing the same shall be of sufficient size and capacity to produce a continuous flow of water of at least 200 cubic feet per

minute for each one thousand of the population of the district drained thereby, and the same shall be kept and maintained of such size and in such condition that the water thereof shall be neither offensive or injurious to the health, of any of the people of this State; and before any sewage shall be discharged into such channel or outlet, all garbage, dead animals and parts thereof, and other solids shall be taken therefrom, and said district shall, at the time any sewage is turned into or through any such channel or channels, turn into said channel or channels not less than 20,000 cubic feet of water per minute for every 100,000 inhabitants of said district, and shall thereafter maintain the flow of such quantity of water."

"Sec. 23. If any channel is constructed under the provisions hereof by means of which any of the waters of Lake Michigan shall be caused to pass into the Desplaines or Illinois river, such channel shall be constructed of sufficient size and capacity to produce and maintain at all times a continuous flow of not less than 300,000 cubic feet of water per minute, and to be of a depth of not less than fourteen feet, and a current not exceeding three miles per hour, and if any portion of any such channel shall be cut through a territory with a rocky stratum where such rocky stratum is above a grade sufficient to produce a depth of water from Lake Michigan of not less than eighteen feet, such portion of said channel shall have double the flowing capacity above provided for, and a width of not less than one hundred and sixty feet at the bottom capable of producing a depth of not less than eighteen feet of water. If the population of the district draining into such channel shall at any time exceed 1,500,000, such channel shall be made and kept of such size and in such condition that it will produce and maintain at all times a continuous flow of not less than 20,000 cubic feet of water per minute for each 100,-000 of the population of such district, at a current of not

more than three miles per hour, and if at any time the general government shall improve the Desplaines or Illinois rivers, so that the same shall be capable of receiving a flow of 600,000 cubic feet of water per minute, or more, from said channel, and shall provide for the payment of all damages which any extra flow above 300,000 cubic feet of water per minute from such channel may cause to private property so as to save harmless the said district from all liability therefrom, then such sanitary district shall within one year thereafter, enlarge the entire channel leading into said Desplaines or Illinois rivers from said district to a sufficient size and capacity to produce and maintain a continuous flow throughout the same of not less than 600,000 cubic feet of water per minute, with a current of not more than three miles per hour, and such channel shall be constructed upon such grade as to be capable of producing a depth of water not less than eighteen feet throughout said channel, and shall have a width of not less than one hundred and sixty feet at the bottom." *    *    *

"Sec. 27. If any channel shall be constructed under the provisions of section 23 of this act, it shall be the duty of the trustees of such district, when such channel shall be completed, and before any water or sewage shall be admitted therein, to duly notify, in writing, the Governor of this State of such fact; and the Governor shall thereupon appoint three discreet persons as commissioners, one of whom shall be a resident of the city of Joliet, or between said city and the city of LaSalle, and one a resident of the city of LaSalle, or between said city and the city of Peoria, and one a resident of the city of Peoria, or between said city and the mouth of the Illinois river, to inspect said work. The said commissioners shall, within ten days after such appointment meet at the city of Chicago, and shall appoint a competent civil engineer, and they may employ such other assistance as they may require to expeditiously perform their duties. The said

commission shall take as their datum line for the survey the datum established by the Illinois and Michigan canal trustees in 1847, and shall make such examination and surveys of Chicago river and of the channel or channels authorized by this act as shall enable them to ascertain whether said channel is of the character and capacity required by this act. And in case they shall find the work in all respects in accordance with the provisions of section 23, of this act, they shall so certify to the Governor, who shall thereupon authorize the water and sewage to be let into said channel. But in case said commissioners shall find said channel is not constructed in accordance with the provisions of this act, it shall be their duty to file in any court of competent jurisdiction, on the chancery side thereof, in their name as such commissioners, a bill against said corporation, which bill shall set forth wherein said work is deficient and fails to comply with the provisions of this act; and said court shall thereupon issue an injunction without bond against said defendant, enjoining and restraining it from admitting water or sewage into said channel until the final order of the court. And in case said court, upon hearing, shall determine that said channel is not constructed in accordance with the provisions of this act, said injunction shall be continued until the provisions of this act shall have been fully complied with." * * *

—And require the trustees of the sanitary district to cause a channel to be constructed of sufficient capacity to carry 300,000 cubic feet of water per minute as a minimum discharge, with a current not exceeding three miles per hour, and also require such portions of such channel as are cut through the solid rock to have a capacity of 600,000 cubic feet of water per minute, and to turn into said channel not less than 20,000 cubic feet of water per minute for every 100,000 inhabitants in said district, and thereafter to maintain the flow of such quantity of water, and before any water or sewage should be by them ad-

mitted to said channel, to notify the Governor and obtain
from him a permit authorizing the water and sewage to
be let into said channel.

In December, 1899, the trustees reported to the Gov-
ernor that the said work upon the channel from Robey
street to Lockport had been completed.   Thereupon he
appointed a commission, which, after an inspection, re-
ported favorably, and on the 17th day of January, 1900,
a formal permit was issued by him, under which water and
sewage were immediately let into the channel, through
which they have since flowed.   By reason, however, of
legislation of the Congress of the United States extend-
ing the jurisdiction of the Federal government over the
Chicago river and its branches, it was necessary for the
trustees of the appellee, before connecting its main chan-
nel with the south branch of the Chicago river, to obtain
the consent of the Secretary of War and the chief of
engineers of the United States government, which per-
mission was obtained on the 8th day of May, 1899, and a
permit issued to said district authorizing it to divert the
waters of the Chicago river and cause them to flow into
its artificial channel at Robey street, which permit is
as follows:

"Whereas, by section 10 of an act of Congress ap-
proved March 3, 1899, entitled 'An act making appro-
priations for the construction, repair and preservation
of certain public works on rivers and harbors, and for
other purposes,' it is provided that it shall not be law-
ful to alter or modify the course, location, condition or
capacity of the channel of any navigable water of the
United States unless the work has been recommended by
the chief of engineers and authorized by the Secretary of
War, prior to the beginning of the same; and whereas,
the Sanitary District of Chicago, a municipal corpora-
tion, organized under the laws of the State of Illinois,
has constructed an artificial channel from Robey street,
Chicago, to Lockport, and has been heretofore granted

permission by the Secretary of War to make certain im- provements in the Chicago river for the purpose of cor- recting and regulating the cross-section of the river so as to secure a flowage capacity of 300,000 cubic feet per minute, with a velocity of one and one-quarter miles an hour, it being intended to connect the said artificial chan- nel with the west fork of the south branch of the Chicago river at Robey street, in the said city of Chicago; and whereas, the said Sanitary District of Chicago has now applied to the Secretary of War for permission to divert the waters of the said Chicago river and cause them to flow into the said artificial channel at Robey street, as aforesaid; and whereas, the said Sanitary District of Chicago represents that such movable dams and sluice gates as are necessary to at all times secure absolute and complete control of the volume and velocity of flow through the Chicago river have been constructed:

"Now, therefore, the chief of engineers having con- sented thereto, this is to certify that the Secretary of War hereby gives permission to the said Sanitary Dis- trict of Chicago to open the channel constructed and cause the waters of Chicago river to flow into the same, subject to the following conditions:

"1. That it be distinctly understood that it is the in- tention of the Secretary of War to submit the question connected with the work of the Sanitary District of Chi- cago to Congress for consideration and final action, and that this permit shall be subject to such action as may be taken by Congress.

"2. That if, at any time, it becomes apparent that the current created by such drainage work on the south and main branches of the Chicago river is reasonably ob- structive of navigation or injurious to property, the Sec- retary of War reserves the right to close said discharge through said channel, or to modify it to such extent as may be demanded by navigation and to property inter- ests along said Chicago river and its south branches.

"3. The Sanitary District of Chicago must assume all responsibility for damages to property and navigation interests by reason of the introduction of the current in Chicago river.

"Witness my hand this 8th day of May, 1899.

R. A. ALGER, *Secretary of War.*

JOHN M. WILSON, *Brig.-Gen., Chief of Engineers, U. S. A.*"

It will be observed the statute under which the appellee is organized requires a discharge of not less than 300,000 cubic feet of water per minute through said channel, with a current of not exceeding three miles an hour, while the permit of the Federal government limits the discharge from the Chicago river into said channel by requiring that a current shall not be created in said river to exceed one and one-quarter miles per hour. The evidence shows the Chicago river to be a narrow and crooked stream and obstructed in many places, so that with a discharge of 300,000 cubic feet of water per minute from the river into said channel a current would be created in the river of much greater velocity than one and one-quarter miles per hour, which would be a violation of the terms of the permit granted to the appellee by the Federal government, make navigation in the river dangerous and subject the rights of appellee to take water from the Chicago river to forfeiture, and thereby render it impossible for appellee to accomplish the purposes for which it was created. Upon the hearing, Mr. Isham Randolph, the chief engineer of the sanitary district, testified: "The permit to open the gates at Lockport and permit the flow went into effect the morning of January 17, 1900. The condition existing in the Chicago river at that time, and which has not been remedied, was such that the Chicago river could not give the full flow required by law and at the same time conform to the requirements of the Secretary of War, under which the permit was given to use the Chicago river. The current has exceeded two miles an hour in certain narrow and restricted portions

of the river, with a flow of 300,000 gallons per minute. There is no connection between the main channel at Robey street and Lake Michigan except through the Chicago river and the south branch. That condition prevailed at the time the commission appointed by the Governor made its report, and prevails now. The center piers of bridges in the Chicago river afford the most serious obstruction which exists in the river to-day with reference to passing 300,000 cubic feet of water per minute through the Chicago river and the south branch thereof. With the bridges there this flow of 300,000 cubic feet per minute cannot be obtained without creating a current which would be an obstruction to navigation or in excess of a mile and a quarter an hour. The presence of these center piers is a menace to navigation with such a current as must obtain in the river with 300,000 gallons per minute flowing, so long as the center piers remain there. The district cannot deliver through the Chicago river 300,000 cubic feet per minute without exceeding a flow of a mile and a quarter per hour. The current would approximate two miles an hour at the narrowest point of the Chicago river in the present condition. A current of two miles an hour in a straight stream without central obstructions would not be a serious matter, but in a crooked stream like the Chicago river, with frequent barriers in the center of the stream, it is a serious matter. By these barriers I mean center-pier bridges and the protection piers which go along with them."

On April 21, 1891, the Sanitary District of Chicago passed the following resolution:

"*Resolved*, That this board hereby orders that the Sanitary District of Chicago do forthwith enter upon, use, widen, deepen and improve the Chicago river from its mouth at Lake Michigan to the south branch thereof, and also the south branch thereof, together with the south and west fork thereof, so as to make the same a proper and sufficient supply channel for the main channel heretofore surveyed from the Chicago river to Joliet; and further, that the acting chief engineer be and

he is hereby directed immediately to investigate and report upon the capacity of said river and its south branch and forks for that purpose, and also as to any changes that should be made therein, and that a copy of this resolution, certified by the clerk, be forthwith transmitted to the mayor and common council of the city of Chicago and the Secretary of War of the United States." * * *

And in pursuance of said resolution afterward formulated a plan for the improvement of the Chicago river by widening and deepening the same, and by ordinance duly adopted declared the said Chicago river to be a part of its main channel, and provided for the carrying out of the plans adopted for the improvement of said river, to the end that a sufficient flow of water therefrom might be obtained to enable it to comply with the statute directing it to carry through said channel 300,000 cubic feet of water per minute, with a current not exceeding three miles per hour in said channel.

Sections 7 and 17 of the said Sanitary Drainage act (Hurd's Stat. 1899, pp. 329-331,) are in part as follows:

"Sec. 7. The board of trustees of any sanitary district organized under this act shall have power to provide for the drainage of such district by laying out, establishing, constructing and maintaining one or more main channels, drains, ditches and outlets for carrying off and disposing of the drainage (including the sewage) of such district, together with such adjuncts and additions thereto as may be necessary or proper to cause such channels or outlets to accomplish the end for which they are designed in a satisfactory manner." * * *

"Sec. 17. When it shall be necessary in making any improvements which any district is authorized by this act to make, to enter upon any public property or property held for public use, such district shall have the power so to do and may acquire the necessary right of way over such property held for public use in the same manner as is above provided for acquiring private property, and may enter upon, use, widen, deepen and im-

prove any navigable or other waters, water-ways, canal or lake: *Provided*, the public use thereof shall not be unnecessarily interrupted or interfered with, and that the same shall be restored to its former usefulness as soon as practicable." * * *

By virtue thereof said district is not only authorized to enter upon and use, widen and deepen any navigable stream or water-way, but it is also authorized to construct such adjuncts and additions thereto as may be necessary or proper to cause such channels or outlets to accomplish the end for which they are designed, in a satisfactory manner. Taking into consideration said sections of the act, in connection with what appears to be an absolute necessity of entering upon, widening and deepening the Chicago river in order to comply with the law under which the district is organized and not to violate the terms of the permit granted by the Federal government, we are of the opinion that the appellee has power, with the consent of the Federal government and upon the payment of such damages as it may cause, to widen and deepen the Chicago river so that the same shall have sufficient capacity to supply the artificial channel of the sanitary district with sufficient water to enable it to comply with the act under which it is organized, without violating the regulations and requirements of the Secretary of War. To hold otherwise would be to hold that the appellee had power to construct a channel from Robey street to Lockport, but that it had no power to obtain the water from Lake Michigan through the Chicago river so as to render it possible to utilize said channel.

The insistence of appellant that the construction of bridges over the Chicago river by the sanitary district is in excess of its power, in view of what has already been said, is without force. The evidence shows that the widening of the river would leave the old bridges disconnected from the river banks; that said bridges, with one or two exceptions, are now constructed upon

center piers, and that it will be necessary to replace the same by bridges of different construction, thereby rendering the old bridges unfit for use at the places where now erected. If the changes made by the appellee create the necessity for a new bridge or bridges, there is nothing inequitable or unjust in requiring the district to supply the place of those rendered practically worthless, by new ones.

Neither is there any force in the argument that the jurisdiction over the Chicago river has been committed to and is under the control of the city of Chicago, and that it will not be presumed that the State intended to clothe another of its agencies with jurisdiction over the same stream, because it would cause thereby a conflict between the two local municipal governments. The Chicago river is not under the absolute control of said city, and even if there were no legislation authorizing the sanitary district to improve the river, the city could not do so unless permitted so to do by the Federal government. (*City of Chicago* v. *Law*, 144 Ill. 569.) The improvements contemplated by the appellee in no way conflict with the jurisdiction now exercised by the city of Chicago over the Chicago river.

It is further contended that the bonds in question are within the limitations provided by the act against the creation of indebtedness and the levying of taxes by appellee, and are therefore void. Sections 9, 10 and 12 of the Sanitary Drainage act are as follows:

"Sec. 9. The corporation may borrow money for corporate purposes and may issue bonds therefor, but shall not become indebted, in any manner, or for any purpose, to an amount in the aggregate to exceed five per centum on the valuation of taxable property therein, to be ascertained by the last assessment for State and county taxes previous to the incurring of such indebtedness: *Provided, however*, that said five per centum shall not exceed the sum of fifteen million dollars ($15,000,000.)

"Sec. 10. At the time or before incurring any indebtedness, the board of trustees shall provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof as the same shall fall due, and at least within twenty years from the time of contracting the same: *Provided*, that the net earnings from water power and docks may be appropriated and applied to the purpose of paying the interest or principal of such indebtedness, or both, and to the extent that they will suffice, the direct tax may be remitted."

"Sec. 12. The board of trustees may levy and collect taxes for corporate purposes upon property within the territorial limits of such sanitary district, the aggregate amount of which for each of the years 1895, 1896, 1897, 1898 and 1899, shall not exceed one and one-half per centum of the value of the taxable property within the corporate limits, as the same shall be assessed and equalized for the State and county taxes of the year in which the levy is made, and the aggregate amount of which in any one year after the year 1899 shall not exceed one-half of one per centum of such value." * * *

At the date of the issue of the bonds sought to be enjoined in this proceeding there was an existing indebtedness incurred by the sanitary district aggregating $12,210,000. By the act under which it was organized the district is authorized to incur debts in the aggregate to an amount not exceeding five per centum on the valuation of the taxable property in the district, to be ascertained by the last assessment for State and county taxes previous to the incurring of said indebtedness, provided the same shall not exceed the sum of $15,000,000. Twelve million two hundred and ten thousand dollars plus $2,-375,000 equals $14,585,000. The assessed and equalized valuation of the property within the sanitary district for the year 1899 amounted to $338,674,447. Five per cent of that amount would equal $16,933,722, so that upon the

basis of the assessment of 1899 the sanitary district, after the issue of these bonds, was within the amount which it was by law authorized to raise, both in regard to the percentage of indebtedness and the $15,000,000 limit established by the act.

It is claimed, however, that the board of review of Cook county had so decreased and cut down the assessed valuation of assessable property within said county that five per centum of the amount of the assessed valuation of the taxable property within said district for the year 1900 would not equal the indebtedness of the sanitary district. The bonds in question were issued and sold to the Illinois Trust and Savings Bank October 22, 1900, and the equalized value of the assessable property in the county of Cook was not arrived at by the action of the State Board of Equalization until long after that date. The last assessment for State and county purposes, therefore, was for the year 1899, and upon that basis the sanitary drainage district had a right to contract the indebtedness in the manner that it did.

Under the authority of *Culbertson* v. *City of Fulton*, 127 Ill. 30, the equalized assessed valuation of the property within the Sanitary District of Chicago for the year 1899 alone determined the amount to which the district might become indebted. In that case, on page 37 we say: "The constitution provides that the value of the taxable property must be ascertained by 'the last assessment for State and county taxes previous to the incurring of such indebtedness.' Inasmuch as the indebtedness must be regarded as having been incurred at the date of the contract, * * * we must ascertain the value of the taxable property, for the purposes of this case, from the assessment for State and county taxes for the year 1886, and not for the year 1887. This is so, for the reason that the equalized value of the assessable property in the city of Fulton for the year 1887 was not arrived at by the action of the State Board of Equalization until the first

day of October, 1887. It is the assessment as fixed by the State board which must govern, and the State board did not fix such assessment until after August 15, the date of the incurring of the indebtedness." If the possibilities of the future as to whether values would increase or decrease, according to the assessment as made by boards of review or boards of equalization, should be the test as to the validity of municipal securities, the result would be to practically destroy the value of all such securities.

The further contention of appellant, that the tax of one-half of one per centum upon the taxable property of the district, in view of the proposed reduction by the board of review of Cook county, will not produce a fund sufficient to pay the annual indebtedness of said district and its current running and incidental expenses, and that such power to tax is a limitation upon the power to incur indebtedness, cannot be sustained. A tax of one-half of one per cent upon the taxable property of said district, as shown by the assessment in 1899, would produce $1,693,372, while its then annual indebtedness, including the interest upon said bonds accruing in the year 1891, amounted only to $1,396,450, leaving a surplus of $296,922 in the hands of the trustees, if the full limit of one-half per cent were levied, with which to pay the current running and incidental expenses of the district. Whatever exigencies the future might develop in regard to the reduction of assessable values in said district were unimportant, because, as we have seen, if the taxable property in said district at the time the indebtedness was incurred was sufficient to authorize the issue of said bonds, they could not be defeated by reason of the decreased valuation of the property of said district subject to taxation thereafter.

Neither can the contention that the bonds are void upon the ground that no provision was made by the ordinance, as amended, for the levy of a tax to pay the inter-

est upon the same for the year 1900, be sustained.    The ordinances under which the bonds were issued were passed in the months of September and October, 1900, and directed that the first year's interest, which amounted to $95,000, should be payable, one-half on the first day of April and one-half on the first day of October, 1901.    No interest, therefore, fell due during the year 1900.    The ordinance, as amended, provided for a tax levy for the year 1901 of $225,000, which was ample to pay the first year's interest and leave a surplus sufficient to pay the first maturing bonds, which did not fall due until October 1, 1902.

We are further of the opinion that the court properly dismissed said amended and supplemental bill for want of parties.    It is claimed the bonds were sold to and paid for by the Illinois Trust and Savings Bank on October 22, 1900.    Said amended and supplemental bill subsequently filed attacks the validity of the bonds, challenges the right of the district to levy a tax with which to pay the same, and charges that the same were collusively sold. The Illinois Trust and Savings Bank, therefore, should have been made a party to the said amended and supplemental bill and brought into court, as the court was powerless to declare said bonds invalid and said sale fraudulent and collusive, and thereby forfeit said bank's rights thereto, without having it in court and giving it an opportunity to defend.

We have examined this record with the care which we have deemed the importance of this case demands, and have reached the conclusion that the circuit court did not err in dismissing said bill for want of equity.

The decree of the circuit court will therefore be affirmed.                                   *Decree affirmed.*

Mr. JUSTICE MAGRUDER, dissenting.