(No. 54017.—

THE METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Appellee, v. THE VILLAGE OF ROMEOVILLE, Appellant.

*Opinion filed September 30, 1981.*

Richard T. Buck and David L. Ruttle, of McKeown,

Fitzgerald, Zollner, Buck, Sangmeister & Hutchison, of Joliet, for appellant.

Allen S. Lavin, of Chicago (James B. Murray and Jack L. Shankman, of counsel), for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

The circuit court of Will County entered a judgment on the pleadings upholding the validity of two 1899 ordinances; one adopted by the village of Romeoville (Village), the other by the Metropolitan Sanitary District of Greater Chicago (District). The court declared that, under the ordinances, the duty to maintain the Romeo Road Bridge (bridge) rested with the District. The appellate court declared the ordinances invalid, as being against public policy, and held the Village had a common law and statutory duty to maintain the bridge that predominated over the 1899 ordinances. 87 Ill. App. 3d 58.

The Sanitary District of Chicago was organized in 1890 under "An Act to create sanitary districts and to remove obstructions in the Des Plaines and Illinois Rivers" (1889 act) approved May 29, 1889 (Hurd's Ill. Rev. Stat. 1899, ch. 24, par. 343). In 1899, the District was securing right-of-ways for its main channel along the Des Plaines and Illinois rivers to allow sanitary drainage to flow into those rivers rather than into Lake Michigan. (*Lussem v. Sanitary District* (1901), 192 Ill. 404, 413-15.) On May 3, 1899, the Village adopted an ordinance that provided that the District shall "construct and hereafter maintain" a swing bridge over its main channel of the waterway within the Village. The District enacted a companion ordinance on May 31, 1899, which incorporated the Village ordinance. The District then constructed the bridge and, since 1899, has maintained it.

On March 14, 1979, the District filed a complaint for declaratory judgment that would hold the ordinances invalid and that would require the Village to have a statutory

obligation to assume ownership and maintenance of the bridge.

The underlying issue to be resolved is the validity of the ordinances wherein the District agreed to maintain the bridge.

At the time the ordinances were passed, the District was authorized to purchase, condemn or otherwise acquire land needed to widen or deepen the channel of any stream or river it used and to construct any bridges which may be required as a result. (Sections 8 and 17 of the 1889 act (Ill. Rev. Stat. 1979, ch. 42, pars. 327, 337).) At that time, the Village was authorized to enter into contracts. 1871-72 Ill. Laws 262-63. See Ill. Ann. Stat., ch. 24, par. 2—3—8 (Smith-Hurd 1962).

In 1901, after the effective date of the ordinances, the legislature passed "An Act extending the powers of sanitary districts organized under an act entitled 'An Act to create sanitary districts and to remove obstructions in the Des Plaines and Illinois Rivers'" (1901 act) (Ill. Rev. Stat. 1979, ch. 42, pars. 351 through 35?). Section 3 of the 1901 act (Ill. Rev. Stat. 1979, ch. 42, par. 353) provides:

> "Nothing herein contained shall be construed as depriving any city, village or town, situated wholly or partly within the limits of said sanitary district, of any power now exercised in the operation of said bridges; and any bridges built under the provisions of this act to supply or replace a public street or highway bridge, now or hereafter existing, shall, after the construction of said bridge, be operated and controlled for munic-ipal purposes by said city, village or town within which it is located."

The District asserts that the Village had a common law duty to maintain the bridge, which was subsequently codi-fied in section 3 of the 1901 act. Under the District's view, the ordinances divested the Village of ultimate maintenance responsibility and control, thereby violating public policy as embodied in the common law at the time of their

enactment.

For support, the District relies on *City of Chicago v. Sanitary District* (1949), 404 Ill. 315, where a dispute arose between the city of Chicago and the District as to who was required to maintain six bridges located in the city of Chicago. The bridges were built by the District in the years 1899, 1910 (two bridges), 1926, 1927 and 1930. Although there was no agreement involved, the District had maintained the bridges for up to 43 years. A statute similar to section 3 of the 1901 act was involved, namely section 17 of the 1889 act, which was amended in 1915 to state:

> "[I]f any such bridge *** shall lie wholly within the territorial limits of any one municipality, then any such bridge *** shall on completion be turned over to the corporate authorities of any such municipality free of cost, and shall thereupon become the property of such municipality, and be maintained in good order for public travel by such municipality ***." (1915 Ill. Laws 392-93.)

The parties agreed the statute operated prospectively, but the District argued that section 17 merely reflected an extension of the common law and, therefore, the city had an obligation to maintain all six bridges, including the three built before the 1915 amendment. The court agreed with the District and held that at common law the city was responsible for maintenance, repair and replacement of all six bridges. (404 Ill. 315, 323, 325.) Its rationale was:

> "The public roadways spanning the sanitary district channels are an integral part of the public thoroughfares of the city. For this reason, the city has jurisdiction and control over public highway bridges. The right to exercise jurisdiction and control over the bridges is accompanied by the corresponding duty to maintain and repair the bridges." 404 Ill. 315, 323.

The Village does not dispute that at common law, it was required to bear ultimate maintenance responsibility as well as control of the bridge. It argues, however, that neither the

common law in effect at the time the ordinances were passed, nor section 3 of the subsequently enacted 1901 act, proscribes a municipality from contracting for the performance of maintenance. The Village contends the ordinances did not abdicate its ultimate maintenance responsibility and control of the bridge. Rather, according to the Village's view, the ordinances were, in fact, a contract for the performance of maintenance by the District, a contract into which it had authority to enter (see 1871-72 Ill. Laws 262-63) and which was not in derogation of public policy as embodied in the common law at the time. The Village also argues that the agreement, here, for the performance of maintenance distinguishes this case from *City of Chicago v. Sanitary District*, where no such agreement existed.

*City of Chicago v. Sanitary District* made clear the common law rule that a municipality must bear the ultimate responsibility for the maintenance and repair of bridges constructed by the Sanitary District pursuant to the 1889 act. (See *People ex rel. Smith v. Board of Supervisors* (1924), 314 Ill. 256, 263; *People ex rel. Speck v. Peeler* (1919), 290 Ill. 451, 456-57; *Kreigh v. City of Chicago* (1877), 86 Ill. 407, 410-11; *People ex rel. Kurtz v. Meyer* (1928), 251 Ill. App. 475, 480.) Absent an agreement for the performance of maintenance, the Village would have a common law duty, through its employees, to perform maintenance on the bridge. However, neither *City of Chicago v. Sanitary District* nor the other cases prevents a municipality from entering into a contract with another for the performance of maintenance, so long as the contract does not attempt to divest the municipality of its ultimate responsibility for maintenance or control.

Similarly, section 3 of the 1901 act does not prohibit a municipality from entering into an agreement for the performance of maintenance. As was true with the 1915 amendment to section 17 of the 1889 act, the enactment of section 3 of the 1901 act merely codified the common law

rule requiring a municipality to operate and control bridges constructed by the District. The statute, as does the common law, contemplates a prohibition against divestment of control and ultimate responsibility, but not against a maintenance contract.

The question then becomes whether the 1899 ordinances constituted a maintenance contract, or a relinquishment of responsibility for maintenance and control of the bridge. The ordinances simply provided that the District shall "construct and hereafter maintain a swing bridge over the Main Channel of the Sanitary District of Chicago * * *." Nowhere in the ordinances was there any verbiage to the effect that the Village was divesting itself of its ultimate responsibility for maintenance of the bridge or its liability for failure to do so. Moreover, the District's lack of jurisdiction or control is demonstrated by the fact that it could not destroy the bridge on its own volition. Indeed, no relinquishment of control by the Village is evident in the ordinances. We find that the ordinances did not attenuate the Village's responsibility to see that maintenance is performed in order to make the thoroughfare convenient and safe for the public, nor did they lessen the Village's control over the bridge. See *People ex rel. City of Chicago v. Chicago City Ry. Co.* (1926), 324 Ill. 618, 622; *Kreigh v. City of Chicago* (1877), 86 Ill. 407, 410.

We interpret the ordinances to be a contract entered into by the Village for performance of maintenance services as to the present bridge in return for the Village relinquishing its rights in the preexisting bridge and the land underlying the right-of-way necessary for the present bridge. The Village received the District's promise to maintain the bridge in lieu of payment of just compensation to which the Village would have been entitled had the District proceeded under its power of eminent domain.

For the above-stated reasons, we find the 1899 ordinances are valid. Accordingly, the judgment of the appellate

court is reversed and the judgment of the circuit court of Will County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

MR. JUSTICE SIMON took no part in the consideration or decision of this case.