FOUNTAIN HEAD DRAINAGE DISTRICT, Plaintiff-Appellee, v. THE CITY OF CHAMPAIGN, Defendant-Appellant.

Fourth District No. 4—87—0105

Opinion filed August 27, 1987.—Modified on denial of rehearing October 6, 1987.

Frederick C. Stavins, Corporation Counsel, of Champaign, for appellant.

Dobbins, Fraker, Tennant, Joy & Perlstein, of Champaign (Mary A. Perlstein, of counsel), for appellee.

JUSTICE LUND delivered the opinion of the court:

Appeal is taken from an order of the circuit court of Champaign County entering judgment in favor of the plaintiff, the Fountain Head Drainage District (District), and denying the motion for summary judgment of the defendant city of Champaign (city). Relying principally upon section 12—3 of the Illinois Drainage Code (Code) (Ill. Rev. Stat. 1985, ch. 42, par. 12—3), the court's judgment order requires that the city seek and obtain the consent of the District before it may erect or replace any structure spanning District ditches within Champaign city limits. The judgment order further provides it is permissible for the District to condition such consent upon a court-approved agreement, which may include among its terms a "hold harmless" provision executed by the city in favor of the District. The city must also bear all costs associated with going into court to gain approval of the agreement. In the event accord cannot be reached, the city is ordered by the court to remove two footbridges already constructed.

Because we construe no statutory authority which would require a city to execute a hold harmless provision upon the reconstruction or rebuilding of an existing bridge, that being in conflict with the acknowledged duty of a municipality to maintain its public thoroughfares, we reverse. A strict interpretation of the relevant statutes likewise causes us to conclude a district may not withhold its approval to new construction by exacting certain court-approved conditions unrelated to the natural drainage flow in the area.

The focus of this controversy is on two existing footbridges constructed over drainage ditches within the city of Champaign. On May 29, 1986, the District filed suit for a mandatory injunction that the city remove both footbridges or, alternatively, for a declaratory judgment that the city must first obtain the District's consent to erect footbridges across any ditch.

The facts from the complaint and exhibits in the record are both basic and undisputed. The District is a quasi-municipal corporation empowered with the authority to maintain, repair and protect a drainage system within Champaign County. On October 17, 1983, Daniel S. Winkler, an engineer for the city, sent the District commissioners a "Pedestrian Bridge Replacement" plan for a footbridge over the Copper Slough Ditch just west of Duncan Road in Champaign (the Duncan Road bridge). That design plan was expressly approved by District commissioners at their meeting of November 17, 1983. The minutes of that meeting reflected District engineers recommended acceptance because the new bridge would actually improve the flow of water through the area. However, ultimate approval by the commis-

sioners was made subject to receipt of a "hold harmless" agreement and payment of all court costs by the city.

Various correspondences between the city and the District reflect the city's dissatisfaction with the proposed agreement terms, especially as it viewed the hold harmless provision and payment of court costs. The agreement as drafted mandated payment by the city of all fees and costs, not to exceed $500, incurred while acquiring court approval.

On June 26, 1984, acting without ratification of an agreement, the city completed reconstruction of the Duncan Road footbridge. On March 3, 1986, the city also constructed and installed a new pedestrian footbridge spanning the Copper Slough Ditch near Springfield Avenue (the Springfield Avenue bridge). There was no prior approval or agreement for this second project.

The District then filed its complaint seeking a mandatory injunction or a declaratory judgment. The trial court in its memorandum opinion entered December 4, 1986, relied upon the interplay of sections 12—3 and 12—4 of the Code. (Ill. Rev. Stat. 1985, ch. 42, pars. 12—3, 12—4.) Specifically, the court found no exception or limitation to the language of section 12—3 which states permanent structures, including bridges, shall not be placed by a landowner on the District right-of-way without first obtaining the express consent of District commissioners. (Ill. Rev. Stat. 1985, ch. 42, par. 12—3.) Requiring the imposition of a condition to approval, the court wrote, is "certainly within the realm of good judgment with regard to district business."

Subsequently on January 27, 1987, a written judgment order was entered that: (1) section 12—3 of the Code requires any landowner, including the city, to obtain the consent of District commissioners prior to placing a permanent structure over the drainage district right-of-way; (2) the District may as a basis for granting permission impose conditions such as those set forth in the contested agreement; and (3) in the event the District and city are unable to reach an agreement, the city is required to remove the two footbridges already erected.

Section 12—3 of the Code states in relevant part:

"The owner of any land over, through or across which a district has acquired a right-of-way for the construction and maintenance of an open or covered drain by grant, dedication, condemnation or otherwise, may use the land occupied by such right-of-way in any manner not inconsistent with the paramount easement of the district. Any use of the right-of-way which will interfere with the operation of the drain or will increase the cost to the district of performing any of its work

thereon is deemed to be inconsistent with the district's easement. *No permanent structures, including bridges* and fords, *shall be placed on the right-of-way by a landowner without first obtaining the express consent of the commissioners of the district.*" (Emphasis added.) Ill. Rev. Stat. 1985, ch. 42, par. 12—3.

This quoted portion of section 12—3 appears to grant a right-of-way easement to a District where its drain runs through the land of another. The owner of the underlying fee in the land may utilize that right-of-way so long as such use does not interfere with the drainage operation. The second sentence affords a general example of inconsistent uses of the easement by landowners. Included also is the admonition that construction of permanent structures is forbidden over the right-of-way without the express approval of the District.

The final sentence of section 12—3 (not quoted above) refers to how a landowner may pasture livestock in an open ditch. Should such pasturing damage the ditch, the landowner is responsible for repairs. It is thus apparent to us, as it was to the trial court in its memorandum of opinion, that the overall tenor of section 12—3 is primarily concerned with farmers as landowners and drainage systems located in predominantly agricultural areas.

■■ Contrasted with this statute, as the city argues, is the recognized common law duty of a municipality to maintain its public streets and thoroughfares in a reasonably safe state. As a bridge is a component part of a public thoroughfare, a municipality bears the ultimate responsibility for the construction, maintenance, repair and replacement of bridges. (*Metropolitan Sanitary District v. Village of Romeoville* (1981), 86 Ill. 2d 213, 217, 427 N.E.2d 170, 172; *City of Chicago v. Sanitary District* (1949), 404 Ill. 315, 322-23, 89 N.E.2d 35, 38.) With this responsibility goes the potential for liability where there is a failure to maintain a bridge in a safe condition. (*Metropolitan Sanitary District v. Village of Romeoville* (1981), 86 Ill. 2d 213, 218, 427 N.E.2d 170, 172.)

■ Although inapplicable to the facts at bar, we recognize that where the drain is outside of the natural course of drainage, the drainage district may be responsible for the expense of constructing, repairing, and maintaining roadway structures, even though the actual work most often remains the obligation of the municipality. (Ill. Rev. Stat. 1985, ch. 42, par. 12—4.) Regardless of the financial obligation of the District, the rule that a municipality should be responsible for the upkeep and maintenance of the bridges which are a part of its road system is necessitated by the utilization of bridges as well-trav-

eled public thoroughfares. *Campbell v. City of Marseilles* (1955), 5 Ill. App. 2d 45, 124 N.E.2d 677.

Section 12—4 of the Code also provides that whenever a drain or ditch is constructed in the course of natural drainage across a public highway, a municipality shall construct and thereafter keep in repair a bridge sufficient in length, height and depth to "subserve the needs of the public *** not only as such needs exist at the time of construction, but for all future time." Ill. Rev. Stat. 1985, ch. 42, par. 12—4.

■ Moreover, the sidewalks as well as the streets of a city are held in trust for the use of the public as a normal means of travel. Thus a municipality:

"[I]s charged with the duty of keeping its sidewalks, as well as its streets, in a reasonably safe condition for the use of the public. It is highly important to the safety and convenience of the public that the sidewalks do not become out of repair." (*City of Elmhurst v. Buettgen* (1946), 394 Ill. 248, 252, 68 N.E.2d 278, 281.)

Under this obligation to maintain public sidewalks in good repair, the municipality is conversely held responsible for injuries occasioned by its failure to do so upon notice of an unsafe condition and a reasonable opportunity to correct it. *Hamer v. Village of Deerfield* (1975), 33 Ill. App. 3d 804, 807-08, 338 N.E.2d 242, 246.

■ Footbridges, whether classified technically as bridges or as public walkways akin to sidewalks, are subject to city control and maintenance. The city therefore maintains it should be allowed to discharge its common law and statutory duty of maintenance upon existing structures without another governmental body imposing conditions such as execution of a hold harmless agreement. The city also believes it should be able to act to construct new bridges without the requirement of court approval so long as drainage through the area is unimpeded and there is no interference with the District's paramount easement. The District replies consent to construct a footbridge over a ditch right-of-way is expressly required by section 12—3 as against *any* landowner, including the city. The District also asserts the Code gives it the authority to impose conditions within a court-ordered agreement.

We concur with the city's position. First, when there is an existing structure over a drainage ditch, as is the case here with the Duncan Road bridge, it is incumbent upon the municipality to maintain it in a state of good repair. When the structure deteriorates into a state of disrepair which may cause harm to members of the public otherwise invited to use it, the municipality must be allowed to effectuate

reconstruction efforts. We see no authority in section 12—3 which would authorize District commissioners to withhold their express consent upon extracting conditions such as a "hold harmless" agreement. Section 12—3 protects the interest of the District while also recognizing the right of the underlying landowner, usually a farmer, to use the land adjoining the right-of-way. It does not allow for a district to unreasonably withhold approval of a proper reconstruction plan for the public good where there would be no interference with the drainage system. In this regard we note also the engineer's report to the District commissioners that the Duncan Road bridge would actually improve the drainage flow through that area.

■■ ■ We therefore conclude that when it becomes necessary to repair, reconstruct or rebuild an already-existing structure such as the Duncan Road footbridge, the municipality is obligated to act in order to protect the public. Where only minor repairs are involved, the city need not obtain the express consent of the District. However, the city must give notice to the District and seek its approval of a reconstruction plan. If such a plan does not interfere with the District's drainage system, approval cannot be unreasonably withheld. Such approval may not be tempered upon the execution of certain unrelated conditions. The city must be allowed to discharge its duty; the District must also protect its own rights. By allowing an existing structure used by the public to be rebuilt in a manner not inconsistent with the District's operation upon the giving of proper notice to the District, the spirit of intergovernmental cooperation stressed by our courts is met. See *Wilmette Park District v. Village of Wilmette* (1986), 112 Ill. 2d 6, 490 N.E.2d 1282; *Clement v. O'Malley* (1981), 95 Ill. App. 3d 824, 420 N.E.2d 533, *aff'd sub nom. Clement v. Chicago Park District* (1983), 96 Ill. 2d 26, 449 N.E.2d 81; see also Ill. Rev. Stat. 1985, ch. 42, par. 4—27(i).

The District in pursuing the imposition of conditions such as a hold harmless agreement submits on appeal it is only protecting its own interests in trying to avoid liability for the negligence of another body. However, requiring such an agreement where an unsafe condition may remain unrepaired represents a far more potentially injurious situation to the public at large than can justify the withholding of consent to reconstruct. We also question the absolute need for a hold harmless agreement, as ultimate liability may normally run to the municipality charged with the duty to maintain.

Similarly, a municipality should according to section 12—3 obtain the consent of district commissioners before it may construct a new footbridge across a ditch maintained in the natural flow of drainage.

A city is empowered from a literal reading of section 12—4 to build such bridges. (Ill. Rev. Stat. 1985, ch. 42, par. 12—4.) For the same reasons discussed above, however, we fail to see what statutory authority would allow a district to withhold its consent for the sole purpose of imposing conditions unrelated to the natural flow of water.

■ The District also raises section 4—30 of the Code, which provides that the commissioners of a District must petition the court for an order authorizing the grant of a license, easement, or right-of-way over any ditch. (Ill. Rev. Stat. 1985, ch. 42, par. 4—30(a).) The District postulates according to section 4—30 it is within its rights in seeking court approval of an agreement such as the one at issue here, and to require the city to pay the associated costs. To the contrary, based upon our previous reasoning, we are of the opinion section 4—30 does not apply to the reconstruction of an existing structure in the ordinary case, or to the building of a new structure necessary to serve the public needs, so long as the drainage system is not interfered with, and the rights of the underlying landowner remain unaffected.

To summarize, we hold: (1) the city has both a common law and statutory duty to repair and maintain existing structures such as footbridges; (2) the municipality in seeking to reconstruct or rebuild an existing structure must give notice to, and seek the approval of, District commissioners; (3) District consent should also be obtained for the construction of new bridges; (4) the District has no statutory authority to unreasonably withhold consent or to condition its approval upon the execution of a hold harmless provision; and (5) a court order is not required to review the approval of every reconstruction plan designed to change or correct an existing condition, or for the approval of every new construction plan.

Accordingly, the portion of the judgment of the circuit court which conditions the maintenance, construction, reconstruction, or existence of the two footbridges upon compliance by the city with the agreement requested by the District is reversed. No remand is necessary in regard to issues concerning the Duncan Road bridge, as the work there involved reconstruction for which approval was sought and impliedly obtained. Remand is necessary to decide issues concerning the Springfield Avenue bridge. There we are concerned with the building of a new bridge by the city without any type of approval by the District. We conclude that the public welfare would not be enhanced by requiring its removal. Rather, we direct that upon remand the court hold a hearing and receive such additional evidence, if any, the court shall deem necessary to determine if that bridge is reasonably compatible with the District's drainage system as that concept is de-

scribed in this opinion. If such compatibility is found to exist, the court shall order that the bridge may remain. If the bridge is found to lack that compatibility, the court shall order that the city make such modifications as are necessary to make the bridge conform or otherwise remove the bridge.

Reversed in part and remanded in part.

SPITZ, P.J., and GREEN, J., concur.