KAY CLEMENT et al., Plaintiffs-Appellants, v. PATRICK L. O'MALLEY et al., Defendants-Appellees.

First District (5th Division)   No. 79-1665

Opinion filed April 16, 1981.—Rehearing denied May 8, 1981.

SULLIVAN, P. J., dissenting.

Calvin Sawyier, of Chicago, for appellants.

Joseph A. Power, of Chicago, for appellees.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Plaintiffs appeal from an order dismissing their complaint for a declaratory judgment and injunctive relief against defendants. The complaint alleged that defendant Chicago Park District (Park District) constructed a golf driving range unlawfully in Jackson Park in the city of Chicago. Plaintiffs sought an order directing defendants to restore the site

to the previous condition, or alternatively, that they be enjoined from operating the driving range until securing approval from the Chicago Plan Commission (Plan Commission).

They raise the following issues on appeal: (1) whether construction of the driving range was unlawful because prior approval was not obtained from the Plan Commission; (2) whether construction of the driving range breached the promise of the Park District to restore the area to its prior condition; and (3) whether conversion of an area of Jackson Park from casual open space to a driving range is a misuse of park property constituting breach of the public trust.

The pertinent facts of this case follow and are largely undisputed. Jackson Park is a part of the Chicago Park District system of parks. It consists of approximately 570 acres on the south side of Chicago adjacent to Lake Michigan. In 1957 the U.S. Army leased approximately 11 acres as a site for a Nike Missile Installation. Upon terminating that use in 1971, and in lieu of restoring the property to its original condition (as provided by the lease), the Army paid a sum of money to the Park District. Instead of restoring the area, the Park District in 1978 designated it for use as a golf driving range and fenced in the entire 11 acres. Prior to the Army's use the area had been used for picnicking, casual play activities, jogging and meadow bird nesting.

The record discloses that in April of 1978, an estimate of cost and layout for the driving range was drawn up by the Park District which it hoped could be completed and become operational by July 1, 1978. On May 5, 1978, the Park District submitted "An Application to the Chicago Plan Commission under the Lake Michigan and Chicago Lakefront Protection Ordinance" (hereafter Lakefront Protection Ordinance) seeking approval for construction of the driving range in Jackson Park. The application stated that:

"The Park District submits that the above proposed project is compatible with the guidelines of the Comprehensive Plan for Chicago and that the proposed construction of the new facility will not conflict in any way with the Lake Michigan and Chicago Lakefront Protection Ordinance nor will it conflict with the 14 Basic Policies of the Lakefront Plan of Chicago."

Although the Plan Commission did not place this application on its agenda until June 15, 1978, the Park District advertised for construction and asphalt paving bids by May 15, 1978, awarded contracts on May 23, 1978, and then publicly announced the project on May 25, 1978.

It soon began marking the site for construction. A June 19, 1978,

meeting with community representatives resulted in providing adequate space for both the range and bird nesting areas. The Plan Commission met on July 13, 1978, and received Commissioner Hill's recommendation that the Plan Commission accept the Park District's application. Julian Levi, chairman of the Plan Commission, expressed his personal views that "[a] driving range was a proper installation in a park, just as a golf course is[1] and that citizens who wished to protest the project should address their concerns to the Park District, not the Plan Commission."

Although the Park District moved to withdraw its application from consideration at the Plan Commission's meeting of August 17, 1978, the request was not acted upon because the Commission requested a legal opinion from the corporation counsel of the city of Chicago concerning its jurisdiction over the proposed project.

Plaintiffs filed the instant suit on August 21, 1978. By August 30, 1978, the Park District had installed steel mesh fencing and fence posts, bulldozed trees and shrubs within the fenced area and closed the site to the public. Pursuant to the prayers of the complaint, the trial court granted a preliminary injunction on September 6, 1978, and directed the Plan Commission to determine whether the project was governed by the Lakefront Protection Ordinance. The Plan Commission did not comply with the court's order, arguing that it was not a party to the suit and that no Park District application was pending before it. Plaintiff's motion to add the Plan Commission as a party was denied. Later, the trial court held that because the Park District was an "independent body corporate and politic," the Lakefront Protection Ordinance did not apply to it and dismissed count I on April 10, 1979. After a hearing on plaintiff's motion to vacate, the complaint was dismissed in its entirety on September 6, 1979. In so ruling, the court reversed the holding in its April 10 order concerning the applicability of the Lakefront Protection Ordinance, which stated as follows:

"However, upon reconsideration, I find that the Jackson Park area, having been designated as a historical monument is subject to the terms and conditions of the Chicago Lakefront [sic] [Protection] Ordinance; and I find that the Chicago * * * Plan Commission was derelict in their duty in refusing to proceed further and to hear and decide this matter with respect to the construction of this site in this area; and to that extent, I reverse my original finding dismissing Count I and I enter a finding for the plaintiff * * *."

The trial court orally found "that it is not necessary for the Park

---

[1] An 18-hole golf course had been in use in Jackson Park for many years.

District to submit this project to the Chicago Plan Commission because the principal reason is that I found this to be a proper park purpose." The court made the following written findings—that the golf driving range was a proper park function; that "with respect to this particular construction project and this particular case the approval of the Chicago Plan Commission is not necessary"; and that the question of fees or a charge for the use of park facilities was not properly presented. It is from that order that this appeal was taken.

OPINION

Plaintiffs contend essentially that the Plan Commission is authorized under the Lakefront Protection Ordinance to regulate construction projects of state and municipal agencies on lands dedicated by statute as encompassed within the system of Chicago's Lakefront Parks; that the Park District acted unlawfully in failing to secure the Plan Commission's approval for construction of the driving range; that the construction project breached the Park District's obligation to restore the area to the condition that existed prior to its use as a Nike missile site; that conversion of a significant part of multiple-use open space in Jackson Park to a fenced-off single use requiring payment of a fee violates the public trust placed in the Park District by the legislature when it designated Jackson Park as a public park; and that, as a remedy, the Park District should be ordered to dismantle the driving range or to suspend operations pending Plan Commission approval. The Park District maintains, on the other hand, that its construction projects are not subject to the Plan Commission and that, in any event, the project in question did not require such approval, as it was a proper park purpose.

Jackson Park was originally acquired for use as a public park under the authority granted by a statute enacted in 1869 (I Private Laws 1869, at 358) which provided that a five-person board of park commissioners, known as the South Park Commissioners and appointed by the Governor, be authorized to select certain specifically described land. Section 4 of the statute further provided that the lands:

"* * * when acquired by said Commissioners, as provided by this act, shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever, subject to such necessary rules and regulations as shall from time to time be adopted by said commissioners and their successors, for the well ordering and government of the same." (I Private Laws 1869, at 360.)

In 1933, pursuant to statute, the South Park District and each of the

various park districts in Chicago were consolidated into the present Chicago Park District. Ill. Rev. Stat. 1979, ch. 105, par. 333.1.

Plaintiffs point out that, notwithstanding the Park District's jurisdiction over lakefront parks, Chicago is empowered by statute to adopt ordinances designating specific areas as "having a special historical, community, or aesthetic interest or value." (Ill. Rev. Stat. 1969, ch. 24, par. 11—48.2—2.)[2] The statute provides that:

> "[I]n connection with such areas, * * * so designated by ordinance, whether owned or controlled privately or by any public body, to provide special conditions, to impose regulations governing construction, alteration, demolition and use, and to adopt other additional measures appropriate for their preservation, protection, enhancement, rehabilitation, reconstruction, perpetuation, or use, * * * ." Ill. Rev. Stat. 1969, ch. 24, par. 11—48.2—2.

The city of Chicago, under the authority of section 11—48.2—2 of the Municipal Code, created the Lakefront Protection District under its Lakefront Protection Ordinance and designated the area as "a district having special environmental, recreational, cultural, historical, community and aesthetic interests and values * * * ." (Chicago, Ill., Municipal Code, ch. 194B—1.) In addition, the city of Chicago delegated authority to the Plan Commission as an agency to "prepare and recommend" (Ill. Rev. Stat. 1977, ch. 24, par. 11—48.2—3) to the city a comprehensive development plan. The power to designate such agency charged with the administration of Chicago's regulation of special areas such as the lakefront park has existed since 1963. (Ill. Rev. Stat. 1969, ch. 24, par. 11—48.2—3.) The Plan Commission approved the Lakefront Protection Plan of Chicago (adopted by Ordinance, September 24, 1973, Journal of the Chicago City Council, at 6486-87), which the Lakefront Protection Ordinance was designed to implement. (Chicago, Ill., Municipal Code, ch. 194B—1.) The Plan Commission was further authorized to effectuate the City's purpose of protecting the lakefront parks by means of the Lakefront Protection Ordinance, which empowers the Plan Commission to approve applications from public agencies proposing construction and other projects in the lakefront parks. (Chicago, Ill., Municipal Code, ch. 194B—6.1(a).) On its face, the ordinance purports to include all State and municipal agencies, since it is expressly made applicable to any "public agency," which is defined to include "any * * * district * * * municipality * * * or any * * * board, commission, or other body politic or

---

[2] Section 11—48.2—2 was amended by an act effective in 1971. That amendment expressly provided that the "amendatory Act of 1971 does not apply to any municipality which is a home rule unit." (Ill. Rev. Stat. 1979, ch. 24, par. 11—48.2—2.) Consequently, the 1969 version of the statute, as set forth above, continues in effect for the City of Chicago.

corporate or subdivision of the State of Illinois, whether herein specifically mentioned or not." Chicago, Ill., Municipal Code, 194B—4.2(d).

As an additional regulatory measure, the Lakefront Protection Ordinance establishes certain prohibitions, among which the following is significant:

"It shall be unlawful for any physical change, whether temporary or permanent, public or private, to be undertaken, including, but not limited to, * * * construction of any kind, within the Lake Michigan and Chicago Lakefront Protection District, * * * without first having secured the approval therefor from the Chicago Plan Commission * * *." Chicago, Ill., Municipal Code, ch. 194B—5.1.

The statutes and ordinance as set forth above appear to grant to the Plan Commission, as a duly delegated agency of Chicago, ultimate authority to approve or veto any proposed construction project in a lakefront park by any State or municipal agency. In direct conflict with this scheme, however, is the Inter-Agency Referral Act (Ill. Rev. Stat. 1979, ch. 24, par. 11—12—4.1) (the Act), which specifically provides that the Plan Commission's negative report as to any proposed change by any public body or agency cannot prevent the change, but is merely advisory. The statute reads that:

"Whenever a municipality of more than 500,000 population has created a plan commission pursuant to the provisions of this Division 12, every plan, design or other proposal by any public body or agency * * * which changes the use of any real property owned or occupied by any public body or agency or the location of any improvement thereon within the territorial limits of the municipality, shall be referred to the plan commission * * * to authorize such changes * * *. *A report that any such plan, design, or other proposal is not in conformity with the long range planning objectives of the municipality, or the official plan for the municipality * * * shall not bar the public body or agency having jurisdiction over such real property or improvement thereon from thereafter making such changes * * *.*" (Emphasis added.) Ill. Rev. Stat. 1979, ch. 24, par. 11—12—4.1.

■■ The Act and the Lakefront Protection Ordinance, as derived from section 11—48—2.2, basically apply to the same subject matter (*i.e.*, a public agency's use of its real property), but reach different results. Guidance in resolving this conflict can be found in the rules of statutory construction. A primary rule of statutory construction is to ascertain and give effect to the legislature's intent. (*Petterson v. City of Naperville* (1956), 9 Ill. 2d 233, 137 N.E.2d 371.) This is accomplished by giving the language of a statute its plain and ordinary meaning. (*Franzese v. Trinko*

(1977), 66 Ill. 2d 136, 361 N.E.2d 585.) Another basic rule of construction is that two statutes on the same subject matter and parts of a comprehensive statutory scheme should be read *in pari materia* in order to determine legislative intent and avoid injustice. *People ex rel. Scott v. Illinois Racing Board* (1973), 54 Ill. 2d 569, 301 N.E.2d 285.

■■ The plain meaning of the words used in the Act expresses that a report that the proposals are not in conformity with the objectives of a plan commission "shall not bar" the public body or agency from making such changes. Obviously, then, the Act places the ultimate authority in the Park District to make changes in the use of its real property. We find this reading to be in harmony with the legislature's intent, because section 1 of "An Act in relation to * * * the Chicago Park District" (Ill. Rev. Stat. 1979, ch. 105, par. 333.1), which is the grant of powers to the Chicago Park District and its predecessors, has provided that the Park District is to exercise those powers as an independent corporate entity. There is no provision in that section or any other portion of the Park District Code that these powers are to be exercised under the control of the Chicago Plan Commission. To hold otherwise, would effectively transfer the powers of the Chicago Park District to the Chicago Plan Commission.

The General Assembly entrusted to the Park District, not the city of Chicago, the power to control and supervise all parks within the corporate limits of the city of Chicago. (Ill. Rev. Stat. 1979, ch. 105, par. 333.1.) The Park District, as a body politic (Ill. Rev. Stat. 1979, ch. 105, par. 333.3), has the authority to acquire, lay out, establish, construct and maintain parks within its jurisdiction (Ill. Rev. Stat. 1979, ch. 105, par. 333.7—01), and can establish by ordinance all needful rules and regulations to govern and protect all parks. (Ill. Rev. Stat. 1979, ch. 105, par. 333.7—02.) More specifically, the Park District has the power to acquire, construct and operate golf courses and other necessary facilities pertinent thereto. Ill. Rev. Stat. 1979, ch. 105, par. 9.1—1.

Illinois case law recognizes this statutory grant of authority to the Park District as the independent body charged with the responsibility of managing its parks. As early as 1894, the Illinois Supreme Court in *West Chicago Park Commissioners v. City of Chicago* (1894), 152 Ill. 392, 38 N.E. 697, commented on the sovereignty of the Park District and its role in relation to the city of Chicago:

> "The park board [predecessor to the Park District], within the purview of its powers, is a corporation endowed with the same corporate functions, derived from the same source, and exercised in substantially the same way, as the city of Chicago. It is in no sense a corporation organized to exercise a portion of the municipal powers and functions of the city, and in subordination to it, but, within its own sphere, it has the same rank, and the exercise of

its corporate powers is as exclusive of any power on the part of the city to interfere, as if the two corporations occupied wholly separate areas of territory." 152 Ill. 392, 405, 38 N.E. 697, 700.

The Illinois Appellate Court followed the reasoning of *West Chicago Park Commissioners* in *Chicago Medical Society v. South Park Commissioners* (1909), 150 Ill. App. 564. There, the Chicago Medical Society in cooperation with the city attempted to erect in Grant Park a monument fashioned from a large boulder. In upholding the authority of the Park District to resist this effort, the court stated:

"We do not think that the city of Chicago, much less the Medical Society, has any lawful right to instal or maintain any monument or other structure which would in any way interfere with or tend to obstruct the plans of the Park Commissioners for the improvement or adornment of the park. The care and maintenance of the parks are entrusted to the commissioners by law, and their judgment must control. With such control no one has the lawful right to interfere." *Chicago Medical Society*, 150 Ill. App. 564, 566. See also *Decatur Park District v. Becker* (1938), 368 Ill. 442, 14 N.E.2d 490; *People ex rel. Hoyne v. Chicago Motor Bus Co.* (1920), 295 Ill. 486, 129 N.E. 114.

■■■ In summary, the law in this State is well established that the Park District exercises plenary and exclusive jurisdiction over its parks. It alone must decide upon the propriety of construction work done upon its premises. To hold that the city of Chicago can empower the Plan Commission to condition any such work upon its approval would controvert the express mandate of the legislature establishing the Park District's independence. This court will not give effect to an ordinance of one unit of local government which frustrates and contravenes the statutory authority granted to another. (*City of Des Plaines v. Metropolitan Sanitary District* (1971), 48 Ill. 2d 11, 268 N.E.2d 428.) We are mindful, however, that the Lakefront Protection Ordinance as derived from chapter 24 must be read *in pari materia* with the Act in order to give effect to each. Therefore, in order to encourage cooperation between the co-equal governmental units having a statutory interest in this matter of public concern, the Park District must comply with the Lakefront Protection Ordinance to the extent that it does not interfere with its statutory purpose in maintaining its parks. (See *Village of Swansea v. County of St. Clair* (1977), 45 Ill. App. 3d 184, 359 N.E.2d 866.) In this case, while the Park District must submit its application to the Plan Commission for its opinion regarding the construction of the driving range in Jackson Park, such opinion, if given, will not control the Park District's decision to implement changes within its territory that are authorized by its broad statutory authority.

■■ Finally, we reject the argument that the Act does not govern this case since it was only designed to apply to plan commissions created after January 1, 1980, the effective date of the amended statute (Ill. Rev. Stat. 1979, ch 24, par. 11—12—4.1), and not to those created under the 1969 Act (Ill. Rev. Stat. 1969, ch. 24, par. 11—48.2—3). The Act pertains to plan commissions created by municipalities "of more than 500,000 population." By specifically designating such heavily populated municipalities, the legislature revealed its intent that the Act should apply to the plan commission of the city of Chicago. In fact, the city of Chicago has been at all times pertinent the *only* municipality in this State of such size, and is therefore certainly the one referred to in the Act. Undoubtedly, the legislature would not have provided for plan commissions of municipalities that did not even exist.

It has been argued that the conclusion we have reached invites the Park District to disregard the wishes of the community as expressed through the Plan Commission proceedings. The record shows, however, that the driving range was constructed in response to community demands. In addition, site meetings were held between Park District personnel and community representatives. Notwithstanding, it is the park commissioners, appointed by the mayor of the city of Chicago with the approval of the city council (Ill. Rev. Stat. 1979, ch. 105, par. 333.3) who are responsible for the government and protection of the parks. If the commissioners exceed their statutory grant of authority, the court will provide injunctive relief. (*City of Des Plaines v. Metropolitan Sanitary District* (1971), 48 Ill. 2d 11, 268 N.E.2d 428.) Thus, the power of the Park District to make changes in the use of its property will not be unchecked.

We recognize that the Lakefront Protection Ordinance remains effective to the extent that it requires the park commissioners to consider in their decision-making process the views of the public as expressed through Plan Commission hearings. (Chicago, Ill., Municipal Code, ch. 194b—6.1(b).) Their ultimate decision, though, cannot be construed to provide a veto power in the Plan Commission under the Lakefront Protection Ordinance, which would, if applied to this case, denigrate the effective functioning of the Park District.

■■ We agree with the decision of the Commissioners of the Park District that it was proper to install a driving range in Jackson Park. The trial court made an oral finding that the facility was a proper park purpose, and Plan Commission Chairman Levi expressed his opinion that "[a] driving range is a proper installation in a park * * *." The record also discloses that in recent years other projects involving change in recreational use in Jackson Park have been made. While certain members of the community would preserve the natural character of the parks and open lands, those officials charged with administrative responsibilities must fashion solutions to

society's changing demands for recreational facilities and, in responding to these needs, may find it necessary "to encroach to some extent upon lands heretofore considered inviolate to change." *Paepcke v. Public Building Commission* (1970), 46 Ill. 2d 330, 347, 263 N.E.2d 11, 21.

■■ Plaintiffs' contention that construction and operation of the driving range constitutes a breach by the Park District of the public trust appears to have little merit. To determine the validity of proposed changes in the use of public trust lands, the supreme court has formulated the following standards as guides:

> "(1) that public bodies would control use of the area in question, (2) that the area would be devoted to public purposes and open to the public, (3) the diminution of the area of original use would be small compared with the entire area, (4) that none of the public. uses of the original area would be destroyed or greatly impaired and (5) that the disappointment of those wanting to use the area of new use for former purposes was negligible when compared to the greater convenience to be afforded those members of the public using the new facility." (*Paepcke v. Public Building Com.* (1970), 46 Ill. 2d 330, 343-44, 263 N.E.2d 11, 19. See also *Paschen v. Village of Winnetka* (1979), 73 Ill. App. 3d 1023, 392 N.E.2d 306.)

We believe that the Jackson Park driving range satisfies all of these tests. The property will still be controlled by the Park District. The mere fact that a fee is charged "for the use of special facilities" (*MacNeil v. Chicago Park District* (1948), 401 Ill. 556, 563, 82 N.E.2d 452, 455) does not as such render the facility closed to the public, provided such fees are reasonable for the general population of the community. In this respect, we note nothing in the record to indicate the charges were unreasonable. Moreover, the designation of 11 acres as a driving range is small compared to the approximately 570 total acres in Jackson Park (see *Nichols v. City of Rock Island* (1954), 3 Ill. 2d 531, 121 N.E.2d 799), and the public uses of the original area have not been destroyed or greatly impaired since picnicking, casual play activities, jogging, and meadow bird nesting are still possible elsewhere in the park. Finally, due to the small amount of land taken up by the driving range relative to total park acreage, the disappointment of those wanting to use the area for former purposes is likely to be slight—particularly since the range now offers the same convenience to south area public which has been provided in the north area for many years in Lincoln Park.

Plaintiffs finally contend that Chicago was authorized under its home-rule powers (Ill. Const. 1970, art. VII, §6) to make the Lakefront Protection Ordinance binding on the Park District.

■■ Suffice it to say that our supreme court has held that the subsequent acquisition of home-rule powers does not alter the legal relationship

previously existing between a city and another governmental unit. (*City of Des Plaines v. Metropolitan Sanitary District* (1974), 59 Ill. 2d 29, 319 N.E.2d 9.) Since we have found that the city had no power to prevent Park District construction activities prior to its acquisition of home-rule powers pursuant to the Illinois Constitution of 1970, the legal relationship between the parties in this instance remains unchanged.

Summarizing, we have stated our agreement with the finding of the trial court that the driving range was a proper park purpose. We have also found that the Park District was not and is not subject to the provisions of the Lakefront Protection Ordinance under which approval of the Plan Commission was required for the project in question; that Chicago was not authorized under its home rule powers to make the Lakefront Protection Ordinance binding on the Park District; and that the record does not establish any unreasonableness in the charges for the use of the facility.

Accordingly, we affirm the judgment of the trial court.

Affirmed.

MEJDA, J., concurs.

Mr. PRESIDING JUSTICE SULLIVAN, dissenting:

While I concur in the finding of the majority that the construction of the driving range in Jackson Park was a proper park purpose, I do not agree with its holding that the Inter-Agency Referral Act (Ill. Rev. Stat. 1977, ch. 24, par 11—12—4.1) (IARA) should govern the outcome of the present case.

The majority correctly points out that section 11—48.2—2 of the municipal code (Ill. Rev. Stat. 1969, ch. 24, par. 11—48.2—2) (1969 Act) continues to apply to the city, but it gives no indication as to how it reached the conclusion that the Lakefront Protection Ordinance (LPO) purports to apply to all State and municipal agencies. Neither does it reconcile the IARA with the language of the 1969 Act which gives express authorization to municipalities to enact ordinances such as the LPO and to regulate construction projects on specially designated lands. The 1969 Act provides in relevant part:

> "The corporate authorities in all municipalities shall have the power to provide for the official designation by ordinance of areas, * * * having a special historical, community, or aesthetic interest or value; and in connection with such areas, * * * so designated by ordinance, whether owned or controlled privately or by any public body, * * * to impose regulations governing construction, alteration, demolition and use, * * *." (Ill. Rev. Stat. 1969, ch. 24, par. 11—48.2—2.)

The majority fails to explain how the IARA preempts the 1969 Act, upon which the city relied in enacting the LPO, nor does it justify its conclusion that IARA prevails over the LPO. It seems clear that the 1969 Act and the LPO are in harmony and that given their plain and ordinary meaning so as to give effect to legislative intent (*Totten v. State Board of Elections* (1980), 79 Ill. 2d 288, 403 N.E.2d 225; *Franzese v. Trinko* (1977), 66 Ill. 2d 136, 361 N.E.2d 585), they are animated by the single purpose of granting open and explicit authorization to the Plan Commission, as the city's duly constituted agency, to approve any proposed construction project in a Lakefront park by any State or municipal agency. The 1969 Act empowers the city to protect the lakefront parks through creation of the Plan Commission, which enforces the LPO as a city ordinance. (Ill. Rev. Stat. 1969, ch. 24, par. 11—48.2—3.) In essence, the IARA applies only to reports issued by plan commissions and is silent as to the power of the Plan Commission to enforce a city ordinance. The authority of the Plan Commission to issue a report that a proposed construction project is incompatible with the city's comprehensive plan is quite distinct from the Plan Commission's authority as a duly constituted agency of the city to reject the Park District's proposals for construction or other alterations on park lands specially designated for protection by statute. The Park District did, in fact, file an application for Plan Commission approval in an effort to comply with the LPO, which application the City Commissioner of Planning recommended for approval, and the then Plan Commission Chairman expressed an opinion that the ordinance did not apply. However, their actions do not diminish the importance that should attach to the required prior approval, under the law, by the Plan Commission of public construction projects within the Lakefront Protection District.

A principle of reciprocity underlies this rationale. The Park District should not be exempt from the city's statutory authority to regulate the activities of state and municipal agencies in the Lakefront parks. By the same token, the city should not unilaterally preclude the Park District, in the exercise of its statutory authority, from implementing proper park purposes. Because of the often complex nature of government and the existence of many co-equal governmental units, it is necessary that cooperation among such units be encouraged particularly where conflicts over jurisdictional matters arise. Accordingly, the rights of co-equal governmental units must be balanced so as to give maximum effect to enactments under which they were created. (See *City of Des Plaines v. Metropolitan Sanitary District* (1971), 48 Ill. 2d 11, 15, 268 N.E.2d 428, 431 (Goldenhersh, J., dissenting); *Village of Swansea v. County of St. Clair* (1977), 45 Ill. App. 3d 184, 359 N.E.2d 866. See also *City of Highland Park v. County of Cook* (1975), 37 Ill. App. 3d 15, 344 N.E.2d 665.) Implicit in this principle, however, is the corollary that absolute discretion cannot be

excised from one governmental body and engrafted upon another. Moreover, the courts will afford injunctive relief "where an exercise of power exceeds the statutory grant." (*City of Des Plaines v. Metropolitan Sanitary District* (1971), 48 Ill. 2d 11, 14, 268 N.E.2d 428, 430.) In the present case, therefore, while the Plan Commission is obligated by law to make the ultimate decisions concerning the feasibility of construction projects in Lakefront parks, it should not withhold approval from Park District requests which, in light of the totality of the circumstances, are reasonable and consistent with the Park District's statutory authority. The absence of all restraint on the Plan Commission would unnecessarily confine the Park District's activities and ultimately thwart the objectives of the legislature.

The majority's finding that the IARA is dispositive effectively invalidates both section 11—48.2—2 of the 1969 Act and the Lakefront Protection Ordinance. That result would be avoided, however, by a holding that the IARA applies to reports of plan commissions but that section 11—48.2—2 of the 1969 Act applies to certain types of ordinances defined therein. Under that section, a municipality having the status of a home-rule unit (Ill. Const. 1970, art. VII, §6(a)) may create a plan commission and approve, as part of a comprehensive plan, an area designated to have "a special historical, community, or aesthetic interest or value" (Ill. Rev. Stat. 1969, ch. 24, par. 11—48.2—2). In that situation the 1969 Act applies, and consistent with that Act the city has authorized the Plan Commission by means of the LPO as its agency to grant or withhold approval of changes due to construction. See Ill. Rev. Stat. 1977, ch. 24, par. 11—48.2—3.

It also is important to recognize the significant influence that public policy considerations exert on statutory interpretation. (See 2A C. Sands, Sutherland Statutory Construction 401 (4th ed. 1973).) The holding that the Park District is not governed by the LPO invites it to disregard the wishes of the community as expressed through public participation at Plan Commission proceedings. Such a result denigrates the effective functioning of the democratic processes on which administrative agencies such as the Plan Commission are founded and curtails the ability of the public to assist the decision-makers both in the Park District and in the Plan Commission. The majority's interpretation of the statutes in question is, therefore, inconsistent with the public interests here affected. See *City of Philadelphia v. Southeastern Pennsylvania Transportation Authority* (1973), 8 Pa. Cmwlth. 280, 303 A.2d 247; also see *Board of Education v. Board of Education* (1957), 12 Ill. App. 2d 97, 139 N.E.2d 173.

The majority suggests that it gives a common sense interpretation of the IARA as permitting plan commissions to render only advisory opinions, especially as the IARA is read in relation to the status of the Park

838

District. (See Ill. Rev. Stat. 1977, ch. 105, par. 333.1 *et seq.*) However, it appears to me that its interpretation ignores not only the plain meaning of the 1969 Act but also the fundamental rule of statutory construction that two statutes on the same subject matter and parts of a comprehensive statutory scheme should be read *in pari materia* in order to determine legislative intent and avoid injustice. (*Gillespie v. Riley Management Corp.* (1974), 59 Ill. 2d 211, 319 N.E.2d 753; *People ex rel. Scott v. Illinois Racing Board* (1973), 54 Ill. 2d 569, 301 N.E.2d 285; *Petterson v. City of Naperville* (1956), 9 Ill. 2d 233, 137 N.E.2d 371; *People ex rel. Community High School District No. 231 v. Hupe* (1954), 2 Ill. 2d 434, 118 N.E.2d 328.) Moreover, the majority's interpretation seems contrary to legislative intent since its statement that "[t]his court will not give effect to an ordinance of one unit of local government which frustrates and contravenes the statutory authority granted to another" is precisely the consequence of its refusal to read the IARA *in pari materia* with the 1969 Act. Its statement that co-equal units of government should be encouraged to cooperate is not likely to be realized in view of its holding that the Park District may reject, in its discretion, any recommendation of the Plan Commission. The majority's interpretation of the IARA invites the Park District to regard its decisions as inviolate, not only in dealing with the Plan Commission but also with the city and the community.

It is also noteworthy that the cases cited by the majority for the proposition that the Park District exercises plenary power over park lands were decided many years prior to the 1969 Act, which is clearly contrary to those cases to the extent that it authorizes the city through the Plan Commission to regulate construction in Lakefront parks. In essence, by finding that the IARA governs, the city is stripped of its power to delegate authority to the Plan Commission to impose regulations or adopt other measures to preserve and protect areas on which cultural significance has been conferred. It is disingenuous to construe conflicting statutes in a manner detrimental to the city's ability to achieve that goal.

Finally, concerning the home-rule issue, while it may be technically correct to say that *City of Des Plaines v. Metropolitan Sanitary District* (1974), 59 Ill. 2d 29, 319 N.E.2d 9, holds that acquisition of home-rule powers does not alter pre-existing legal relationships between a municipality and another unit of government, that case is distinguishable from the instant case in that *City of Des Plaines* involved a city ordinance that would have had extraterritorial effect on other governmental entities. Such is not the case here with respect to the LPO. Extraterritoriality has been one of the traditional bases for our supreme court's interpretation of the home-rule provision of the Illinois Constitution. *Metropolitan Sanitary District v. City of Des Plaines* (1976), 63 Ill. 2d 256, 347 N.E.2d 716.

It would appear that the city has authority under the home rule

provision of article VII, section 6 to regulate activity in the Lakefront parks, as such regulation clearly pertains to Chicago's "government and affairs." (Ill. Const. 1970, art. VII, §6(a).) The LPO has no impact on any other municipalities or home-rule units and will not affect future developments in the region beyond the city. (See *City of Des Plaines v. Chicago & North Western Ry. Co.* (1976), 65 Ill. 2d 1, 357 N.E.2d 433; *City of Highland Park v. County of Cook* (1975), 37 Ill. App. 3d 15, 344 N.E.2d 665.) Also because of the 1969 Act, the city's exercise of home-rule powers over Lakefront parks does not alter the legal relations between it and the Park District. It thus appears that the city could, under its home-rule powers, enforce the LPO through the Plan Commission, for in so doing the city would be exercising its authority over local affairs. Such action would achieve objectives pertaining exclusively to the city and would not affect any other unit of local government outside its jurisdiction.

In summary, it is my belief that the trial court correctly determined the driving range to be a proper park installation and that the Park District was and remains subject to the provisions of the LPO under which approval of the Plan Commission was required for the project in question.