WILMETTE PARK DISTRICT, Plaintiff-Appellee, v. THE VILLAGE OF WILMETTE, Defendant-Appellant.

First District (3rd Division) No. 84—1006

Opinion filed June 28, 1985.

Robert J. Mangler, of Wilmette, for appellant.

Coffield, Ungaretti, Harris & Slavin, of Chicago (Richard A. Ungaretti, Charlene L. Holtz, and Kevin M. Flynn, of counsel), for appellee.

Harris W. Fawell and Heidi H. Katz, both of Fawell, James & Brooks, of Naperville, for *amicus curiae.*

PRESIDING JUSTICE WHITE delivered the opinion of the court:

This appeal presents the issue of whether a park district, in carrying out its statutory function, is exempt from zoning laws of a home rule municipality. The trial court answered this question in the affirmative and the home rule municipality appeals. Appellant is the village of Wilmette (village); appellee is the Wilmette Park District (park district), organized and operating under the Park District Code (Ill. Rev. Stat. 1983, ch. 105, par. 1—1 *et seq.*).

This is the background of the parties' dispute: In 1921 the village acquired the land known as the Village Green and, until 1973, the village conducted recreational programs there through the village's recreation department. In 1973 the village and the park district adopted ordinances by which all the functions and authority of the village's recreational department were merged into the park district. By adoption of their respective 1973 ordinances, the village relinquished and the park district assumed all power and authority involved with "planning, establishing and maintaining all municipal recreational programs within the boundary of the Village of Wilmette," including those recreational programs conducted at Village Green.

Adjoining Village Green on its eastern boundary is a parcel of land consisting of about six acres. Until December 15, 1982, this land was owned by the New Trier Township School Trustees for the benefit of Wilmette School District No. 39. District 39 used this parcel for many years for a junior high school, but in 1979, District 39 closed the school. The closing of Howard School prompted the village, the park district, the school district and the community to study the best use of the vacant school building, and after numerous public hearings and an advisory referendum, the village purchased the Howard School parcel on December 15, 1982. This purchase was one step of a plan whereby the village would demolish the building and then lease the site to the park district. The plan further contemplated that the park district would combine the Howard School parcel with Village Green to form an enlarged park and recreational area. The combination of these two parcels was in fact carried out, and the combined area became known as Howard Park.

On March 7, 1983, following the acquisition of the Howard School by the village and the demolition of the school buildings located on the site, the village and the park district entered into a new 30-year lease which included both Village Green and the Howard School parcel to be developed by the park district. The 1983 lease reflects the anticipated improvements to be made by the park district at its expense following the reconfiguration of the Village Green athletic fields and proposed construction of two additional unlighted fields on the Howard School site. Paragraph 6 of the 1983 lease specifically provided that improvements could be made by the park district during the term of the lease without the consent of the village, as the owner and lessor of the property. The lease also included a list of specific improvements to be made by the park district "as promptly as practicable" and included, as the most expensive of such estimated improvements, $48,000 for "utilities and lighting." Para-

graph 6(c) of the lease provides that:

> "(c) This paragraph 6 is not intended to affect the obligations, if any, of either party from compliance with the requirements of the Zoning Ordinance of the Village of Wilmette."

The park district claims this subparagraph was inserted by the parties to preserve the two governments' contrasting positions with regard to the applicability of the village's zoning ordinance to properties and recreational programs established and maintained by the park district.

Nevertheless, in August 1983, the park district applied to the village's director of community development for an electrical permit to install lighting for the Village Green athletic fields. The village issued the permit in August 1983. It is the position of the village that its officials thought that the park district was planning to merely replace the lights which had been removed earlier and that the proposed lights would be no more intensive, with no more glare than the lights which they were to replace, and that none of the replacement lights would exceed 60 feet in height, and on this basis, the electrical permit was issued.

In October 1983, the village, as owner, applied to its zoning board of appeals (ZBA) for a special use permit for the Howard School site. The village took the position that a new special use permit was necessary because the use of the Howard School property was being changed from that of a public school to a recreational facility. The park district claims it was unaware of this position during the previous discussions with the village regarding the planned development of the Howard School and Village Green sites.

The village claims it was made clear in all discussions regarding the plan for Howard Park that the Howard School parcel would have to be the subject of a special use permit application for the change of use from a school to a park. A hearing on the special use application was set before the ZBA on November 16, 1983. However, during the first week in November before the hearing, the situation at Howard Park became complicated by the installation of new lights in the park by the park district relying upon the previously issued electrical permit.

The installation included eight poles having a total of 52 fixtures with 1,000 watts in each luminaire. The height of this equipment, as measured to the top of the luminaire, ranged from 65.54 feet for the shortest tower, to 68.41 feet for the tallest tower. The new light poles were eight in number compared to the previous seven poles, and the new poles were placed in different locations from their pred-

ecessors. In fact, three of the new poles were placed on the old Howard School parcel.

The arrival of the new lights generated a high level of interest. At the zoning hearing on November 16, 1983, a large number of persons who lived near the park appeared to express opposition to the new lights. However, the chairman of the ZBA ruled that testimony regarding the lights on Village Green could not properly be considered at the hearing on an application for a special use permit for Howard Park. The ZBA voted to recommend to the village board of trustees that the special use permit should be granted for the Howard School parcel.

At its December 6, 1983, meeting the village board of trustees decided that the ZBA should hold a hearing to consider the issue of the Village Green lights, and that the whole of Howard Park should be treated as an entity and not segmented for zoning purposes. The new application for special use should therefore cover Howard Park in its entirety. The village promptly informed the park district of the village's decision to file a special use application for the entire Howard Park. The application was filed on December 23, 1983, and a hearing was scheduled for March 21, 1984.

Upon learning this, and after some deliberations, the park district advised the village by letter dated March 8, 1984, that it would not participate in the scheduled special use hearing. The presidents of the park district and the village met on March 15, 1984, to iron out the zoning problems, but their efforts failed. On March 20, 1984, the village revoked the electrical permit previously issued to the park district. Shortly thereafter, the park district brought this action for declaratory judgment, injunctive and other relief against the village, requesting the court to find that the park district was not subject to the village's zoning ordinance, to find that the park district need not apply for a special use permit to install new lights on property known as Village Green and to declare null and void the village's revocation of the electrical permit issued to the park to install lights on Village Green. The answer of the village averred, *inter alia*, that it owned Village Green and leased it to the park district, and that the lease contemplated that Village Green be used in compliance with the zoning ordinance. Further, the village alleged that its zoning authority applied to all land in Wilmette, including that owned by other municipal corporations and public entities. The trial court, after a hearing based on the pleadings and the memoranda of the parties, declared as follows:

"*** that Plaintiff, Wilmette Park District, is not subject to

the Village of Wilmette's zoning ordinance in the exercise of its statutory authority over the operations of its parks and specifically:

> (a) that no special use permit need be obtained by Plaintiff in connection with the installation of replacement lighting for the Village Green athletic fields;
>
> (b) that Plaintiff need not request or participate in any special use hearing before the Village Zoning Board of Appeals; and
>
> (c) that the Village's revocation of the electrical permit previously issued is null and void and that installation of the replacement lights may proceed pursuant to the electrical permit as originally issued."

 The parties readily concede the obvious: that operating a park is a proper function of the Wilmette Park District (Ill. Rev. Stat. 1983, ch. 105, par. 8—1), and that zoning is a function of the village of Wilmette (Ill. Const. 1970, art. VII, secs. 6(i), (m)). Indeed, there is no quarrel with the legal proposition propounded by the *amicus curiae* in support of the judgment below that "one local government may not thwart a co-existing unit of local government in the exercise of its fundamental powers, notwithstanding that the first is a home rule entity," nor with the tendered corollary: "when there is a confrontation between two local jurisdictions, the respective powers of each are to be given effect as fully as possible, but one government unit may not enforce its laws so as to frustrate basic statutory purposes and functions of the other." The brief of the park district goes on to declare that "because the imposition of the Village Zoning Ordinance in the manner contemplated will, in fact, frustrate and thwart the Park District's fundamental statutory purpose, it must not be given effect." Because we find no basis in fact or law for this conclusion which undergirds the trial court's decision, we reverse and remand.

We note that there is nothing in the record before us showing that the village in the administration of its zoning law has to date in any way hampered, thwarted, or frustrated the park district in its statutory duty to maintain and operate parks. The park district unilaterally withdrew from the zoning process. We cannot forecast the outcome of an application for a special use permit if the park district should choose to file another one.

But the park district is seeking more than the installation of lights on Village Green. It seeks a declaration that it is not subject to the village's zoning ordinances, and it would follow that it need

not apply for or obtain a special use permit. The cases relied upon by the park district do not support this requested broad sweep of immunity. In *City of Des Plaines v. Metropolitan Sanitary District* (1971), 48 Ill. 2d 11, 268 N.E.2d 428, our supreme court held that in the construction of a water reclamation plant to serve six other municipalities, the sanitary district need not comply with zoning regulations of the city of Des Plaines, because that action was within the sanitary district's statutory powers. The majority opinion added that "the courts will afford protection against any abuse thereof." (48 Ill. 2d 11, 14.) Justice Goldenhersh, writing for the minority, observed that this added language of the majority afforded little comfort because nowhere does the majority indicate where or how an action could be brought to obtain the promised protection. He then noted:

> "In my view of the case these municipal corporations are equal in status, and effect should be given to their respective powers with respect to eminent domain and zoning. Concededly the Des Plaines zoning ordinance makes provision for 'Special Uses' and 'Variations' in proper cases, and judicial review of the host municipality's action on an application for a requested classification would provide the protection against abuse to which the opinion refers." 48 Ill. 2d 11, 16.

The park district relies heavily on its statutory duty to exercise control over park uses and improvements, citing *Clement v. O'Malley* (1981), 95 Ill. App. 3d 824, 420 N.E.2d 533, *aff'd sub nom. Clement v. Chicago Park District* (1983), 96 Ill. 2d 26, 449 N.E.2d 81. In *Clement* this court said:

> "In summary, the law in this State is well established that the Park District exercises plenary and exclusive jurisdiction over its parks. It alone must decide upon the propriety of construction work done upon its premises. To hold that the city of Chicago can empower the Plan Commission to condition any such work upon its approval would controvert the express mandate of the legislature establishing the Park District's independence. This court will not give effect to an ordinance of one unit of local government which frustrates and contravenes the statutory authority granted to another." (95 Ill. App. 3d 824, 832.)

However, we did not hold as the park district urges us to do here that the park district can be totally oblivious of a municipal zoning ordinance in performing its statutory functions. Indeed, the *Clement* opinion says:

> "We are mindful, however, that the Lakefront Protection Ordi-

nance as derived from chapter 24 must be read *in pari materia* with the Act in order to give effect to each. Therefore, in order to encourage cooperation between the co-equal governmental units having a statutory interest in this matter of public concern, the Park District must comply with the Lakefront Protection Ordinance to the extent that it does not interfere with its statutory purpose in maintaining its parks. [Citation.] In this case, while the Park District must submit its application to the Plan Commission for its opinion regarding the construction of the driving range in Jackson Park, such opinion, if given, will not control the Park District's decision to implement changes within its territory that are authorized by its broad statutory authority." 95 Ill. App. 3d 824, 832.

■ The formulae for achieving cooperation between independent agencies in the concurrent exercise of governmental power will differ from case to case. In *Clement,* the park district in constructing on park property a golf driving range having little or no impact on use of surrounding lands, was required nevertheless to comply with the city ordinance and submit its plan to the plan commission for its opinion. In the instant case the new lights on Village Green may well impact on the surrounding residents' enjoyment of their property, depending on the height and intensity of the lights and their hours of use. Yet, the park district seeks exemption from even minimum cooperation as ordered in *Clement.* To achieve the cooperation to which we referred in *Clement,* the park district must comply with the zoning ordinances of the village with its provisions for special uses in proper cases. This process will flesh out facts upon which the courts can determine if in fact the park district is frustrated in the performance of its statutory duties by adherence to the village zoning laws and whether there has been an abuse of power by either the village or the park district.

Reversed and remanded.

McNAMARA and McGILLICUDDY, JJ., concur.