THE STATE OF ILLINOIS MEDICAL CENTER COMMISSION, Counter-plaintiff-Appellee, v. PETER CARLTON AT OGDEN AND OAKLEY, INC., *et al.*, Petitioners and Counterdefendants-Appellants (The City of Chicago, Respondent, Counterdefendant).

First District (1st Division)   No. 87—0321

Opinion filed May 2, 1988.

Jones, Ware & Grenard, of Chicago (Adam Bourgeois, of counsel), for appellants.

Neil F. Hartigan, Attorney General, of Springfield, and Miller, Shakman, Nathan & Hamilton, of Chicago (Michael L. Shakman, Special Assistant Attorney General, and William G. Sullivan, Assistant Attorney General, of counsel), for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

This appeal arises from an order entered December 29, 1986, preliminarily enjoining the City of Chicago (City), Peter Carlton at Ogden and Oakley, Inc. (Carlton), and Walter Daniels Construction Company (Walter Daniels) from continuing construction of a "Popeye's" fried chicken restaurant in the State of Illinois Medical Center District (District) in violation of the land use regulations adopted by the State of Illinois Medical Center Commission (Commission). For the reasons set forth below, we affirm.

The District referred to above is a 460-acre area located on the near west side of Chicago and consists of the University of Illinois Hospital, Rush-Presbyterian, St. Luke's Medical Center, and the West Side Veterans Administration Hospital, among other medical facilities. Its boundaries are defined as Ashland Boulevard on the east, Congress Street on the north, Oakley Boulevard on the west, and a line coincidental with the north line of the Baltimore and Ohio Railroad property near 14th and 15th Streets on the south, as expanded in 1983. (Ill. Rev. Stat. 1985, ch. 111½, par. 5001.) The Commission, created in 1941 by the Illinois legislature and codified in "An Act in relation to the establishment of a medical center district ***" (Ill. Rev. Stat. 1985, ch. 111½, pars. 5001 through 5022), is to manage the District so as "to provide conditions most favorable for the special care and treatment of the sick and injured and for the study of disease." Ill. Rev. Stat. 1985, ch. 111½, par. 5018.

In 1964, pursuant to the Commission's application, the City amended the Chicago Zoning Ordinance by rezoning the District as a planned development (PUD 30). The property at the northeast corner of Ogden and Oakley, 2282 West Ogden Avenue, which Carlton proposed to use for his fast-food restaurant is designated in the PUD 30 land use plan as restricted to "medical and related" uses. The amendment creating PUD 30, however, contains no definition of medical use or of the uses that are "related" thereto. After considering the language of section 8 of the Act and the Chicago Zoning Ordinance,[1] the trial court found "that the intent of the legislature was for the Commission to make land use planning decisions within the District and for the City departments to implement and administer same." As additional support for its position, the court noted, "It is clear that, since the Commission was created in 1964 [sic], and since Planned Development No. 30 was approved by the City Council, the City has deferred to the Commission in making land use decisions within the District."

Until 1967, the property in question was the site of a Standard Oil

---

[1]Section 11.11—3(b) (Chicago Municipal Code art. XI, ch. 194A, par. 11.11—3(b) (1988)) states:

"After the adoption of a planned development ordinance, every application for a permit or license within the planned development boundaries shall be reviewed by the Commissioner of Planning, City and Community Development for a determination that the proposed use, building or structure complies with all provisions of the planned development ordinance. Zoning and occupancy certificates shall be issued by the Zoning Administrator for uses, buildings or structures within the planned development ***."

gas station, a permitted use predating creation of the District.[2] In 1971, the property was acquired by Joseph Davis under a land trust and used as a parking lot for the Audy Home, located across the street, until 1975. Three years later, in 1978, Davis applied to the department of planning for a permit to build a "Church's" fried chicken restaurant on the site, and upon referral of his application to the Commission, the request was denied on the ground that it did not comply with the "medical and related" use limitation of PUD 30.

Then, in January 1982, Davis leased the property to Carlton, who sought to use the property for a "Popeye's" fried chicken restaurant. The 20-year term of the lease was to commence three months after the issuance of a building permit, and it provided that either party could terminate the lease in the event a building permit could not be obtained. Davis testified that he informed Carlton of the difficulty in obtaining a permit to operate a Popeye's on that site.

Carlton ultimately hired Walter Daniels Construction Company, whose manager, Edward Shaeffer, applied to the department of planning for a permit to build the Popeye's. The application was reviewed by the Commission, and by letter dated February 4, 1982, Park Livingston, president of the Commission, declined to approve the permit and so advised Martin Murphy, commissioner of the department of planning. Livingston wrote that the request for the captioned premises "would not be in keeping with the overall plans for the District and within the parameters of P.U.D. No. 30." After receipt of Livingston's letter, Murphy wrote Harry Manley, the zoning administrator of the City of Chicago, on February 10, 1982, disapproving the petitioners' building permit, both because the property use did not qualify in the view of the department of planning as a "medical and related" use and because the Commission had rejected the application.

Notwithstanding the disapproval of Carlton's application by the Commission and the department of planning, on March 9, 1982, the City's department of inspectional services issued a permit for the construction of Carlton's proposed restaurant. Shortly thereafter, construction was commenced on the site and continued until July 1982, when the permit was revoked by the City on the ground that the permit application was not approved by the Commission.

As a result, on July 16, 1982, Carlton and Walter Daniels filed a

---

[2]When the legislature created the District in 1941, it placed the following limitation upon the Commission's power:

> "[T]he power herein conferred shall not be so exercised as to deprive any owner of any existing property of its use or maintenance for the purpose to which it is now lawfully devoted." Ill. Rev. Stat. 1985, ch. 111½, par. 5018.

petition for a writ of *mandamus* seeking to compel the City and certain City officials to reissue the permit. In its answer, the City raised the following affirmative defenses:

> "The relief which petitioners seek would necessarily abrogate the powers and duties of the Medical Center Commission, an agency of the State of Illinois, created under the Medical Center District Act [citation] \*\*\*.

* * *

> 6. The subject permit was awarded as a result of a clerical error: the proposed use of the subject property does not conform to the governing statute (Section 5018) or to the Chicago Zoning Ordinance. The permit was revoked upon discovery of the clerical error."

Shortly thereafter, the Commission intervened as a party defendant and filed an answer in which it asserted that no building permit could properly be issued for the fast-food restaurant because such use had not been approved by the Commission.

On June 21, 1985, while the *mandamus* action was still pending, the City, without approval of the Commission, issued a permit for the construction of the proposed Popeye's. In response, the Commission filed a motion for leave to file a counterclaim against the City, Carlton, and Walter Daniels and to preliminary enjoin them from further construction of the restaurant. On October 3, 1985, a temporary restraining order was issued, and on December 29, 1985, the Commission's motion for a preliminary injunction was granted. It is from this ruling that Carlton and Walter Daniels (hereinafter counterdefendants) appeal. The City is not participating in this appeal.

■ As noted earlier, the primary issue raised by this appeal is whether the Commission has the sole authority to enforce the provisions of PUD 30 concerning land use in the District.[3] In addressing this issue, it is necessary to consider the Act, which established the Commission and the District. It provides in pertinent part:

> "The Commission shall so improve and manage such District

---

[3]Pursuant to trial court order, Donald J. O'Brien, sitting as an independent hearing officer for the Commission, conducted hearings on October 28, 1982, and November 15, 1982, to determine whether the proposed Popeye's was permitted under the Act and PUD 30. Judge O'Brien concluded, after considering the testimony of three witnesses and 12 exhibits, that "the proposed building and use of the site in question does not come within the act or the zoning ordinance now in force." No administrative review of this ruling was sought by counterdefendants pursuant to section 6.06 of the Act. Ill. Rev. Stat. 1985, ch. 111½, par. 5015.

as to provide conditions most favorable for the special care and treatment of the sick and injured and for the study of disease. The Commission shall, by ordinance in the manner hereinafter set forth, classify, regulate and restrict the location and construction of buildings within the District ***, shall regulate the height and size of such buildings, determine the area of open space within and around such buildings, fix standards of construction, control and regulate additions to or alterations of existing buildings and prohibit the use of buildings and structures incompatible with the character of the District ***." (Ill. Rev. Stat. 1985, ch. 111½, par. 5018.)

The manner in which the Commission is to accomplish these objectives is also described in the same paragraph of the Act:

"The Commission shall request the City Plan Commission of the City of Chicago to recommend appropriate zoning regulations for the District which co-ordinate with the zoning of the surrounding sections of the City of Chicago. *** After the adoption of said zoning ordinance or any other proper ordinance of the Commission, it may institute any appropriate action to prevent or abate any unlawful act within the District." (Ill. Rev. Stat. 1985, ch. 111½, par. 5018.)

The language of these provisions clearly empowers the Commission to make land use decisions within the District and bar those uses which it considers unlawful.

In fact, the City itself has acted in recognition of this authority for nearly 20 years. It is undisputed that at all times since PUD 30 was adopted by the City in 1964, the City has submitted each and every building permit for construction in the District to the Commission for its approval. In no instance has the City failed to comply with the determination of the Commission in this regard, except for the two permits issued in March 1982 and June 1985 to counterdefendants. Even after the City asserted it alone had the authority to determine the propriety of land uses within the District, it continued to submit applications for all other building permits within the District to the Commission for approval.

■ Counterdefendants argue that the Act subordinates the Commission's powers over land use to those of the City in stating that "all ordinances adopted by the Commission shall be subject to all restrictions upon the use and maintenance of property within the District prescribed by the Chicago zoning ordinance." (Ill. Rev. Stat. 1985, ch. 111½, par. 5018.) First, this provision is not applicable here, where, as the trial court found, "[T]he City is not attempting to impose re-

strictions on property located within the District but, rather, to lift the restrictions imposed by the Commission." Moreover, while PUD 30 is subject to the "Rules, Regulations and Procedures in Relation to Planned Developments" promulgated by the commissioner of city planning, nothing contained therein authorizes the City to make land use decisions within the District.

█ Notwithstanding the language of the Act and the City's 20-year-long recognition of the Commission's authority, counterdefendants argue that the City's home rule power under article VII, section 6(a), of the 1970 Illinois Constitution supersedes any conflicting legislation enacted prior thereto. Yet, those cases cited by counterdefendants to support this proposition involve private challenges to ordinances enacted by home rule units after 1970. (*Town of Cicero v. Fox Valley Trotting Club, Inc.* (1976), 65 Ill. 2d 10, 357 N.E.2d 1118; *Mulligan v. Dunne* (1975), 61 Ill. 2d 544, 338 N.E.2d 6; *Peters v. City of Springfield* (1974), 57 Ill. 2d 142, 311 N.E.2d 107.) As the trial court here correctly pointed out, there is no post-1970 city ordinance which is inconsistent with the Act in this case. PUD 30 was adopted pursuant to the Act in 1964, and the Chicago Zoning Ordinance in no way conflicts with the Act on land use decisions within the District.

In fact, the 1970 Constitution expressly preserved the powers of existing governmental units. Section 9 of the Transition Schedule provides that, "[t]he rights and duties of all public bodies shall remain as if this Constitution had not been adopted with the exception of such changes as are contained in this Constitution." (Ill. Const. 1970, Transition Schedule §9.) And nothing in the 1970 Constitution purports to change the Commission's land use authority within the District.

Moreover, counterdefendants' home rule argument ignores section 9 of the Act, which provides:

"This Act shall not be construed *** to impair any power now possessed by or hereafter granted to the City of Chicago or to cities generally *except such as are expressly granted to the Commission by Section 8 [paragraph 5018] of this Act.*" (Emphasis added.) Ill. Rev. Stat. 1985, ch. 111½, par. 5019.

Even absent this express limitation on the City's power, the City cannot be deemed to have the exclusive land use authority within the District that counterdefendants urge. In *Metropolitan Sanitary District v. City of Des Plaines* (1976), 63 Ill. 2d 256, 347 N.E.2d 716, for example, the City of Des Plaines sought to enjoin the Metropolitan Sanitary District of Greater Chicago from constructing a sewage treatment plant within the City unless the District obtained a city permit and complied with a city health ordinance. After noting that

the plant would also serve six other municipalities, the supreme court concluded that Des Plaines, despite its home rule authority, could not regulate the sanitary district where to do so would be "incompatible with the purpose of which it [the sanitary district] was created." 63 Ill. 2d at 261, 347 N.E.2d at 719.

Similarly, in *Clement v. O'Malley* (1981), 95 Ill. App. 3d 824, 420 N.E.2d 533, *aff'd* (1983), 96 Ill. 2d 26, 449 N.E.2d 81, although the court required that the Chicago Park District submit its plan to construct a golf driving range on a lakefront park to the Lakefront Protection Plan Commission created by the City of Chicago, it held that the Commission's opinion would "not control the Park District's decision to implement changes within its territory that are authorized by its broad statutory authority." (95 Ill. App. 3d at 832, 420 N.E.2d at 540.) Thus, both *Metropolitan Sanitary District* and *Clement* advocate that legislatively created special districts need comply with municipal zoning ordinances only to the extent that such ordinances do not interfere with the districts' statutory purposes.

*Wilmette Park District v. Village of Wilmette* (1986), 112 Ill. 2d 6, 490 N.E.2d 1282, contrary to counterdefendants' assertion, suggests no different result. The issue presented there was whether the park district was required to seek a special use permit from the village prior to installing new lights in a park surrounded by the village. After noting that "[n]either the Illinois Municipal Code nor the Park District Code provides park districts with immunity from the zoning ordinances of their host municipality" and accepting the appellate court's finding that " 'there is nothing in the record *** showing that the village in the administration of its zoning law has to date in any way hampered, thwarted, or frustrated the park district in its statutory duty to maintain and operate parks,' " the supreme court refused to allow the park district to "exercise its authority without regard to the zoning ordinances of its host municipality." 112 Ill. 2d at 14-15, 490 N.E.2d at 1285.

The supreme court, however, acknowledged that the village's zoning ordinance was not without limit with respect to the park district:

> "Intergovernmental cooperation is, of course, a two-way street. We are mindful that only so long as the village zoning ordinance is established and administered reasonably, and legal recourse is available if this is not the case, will the parties be well served by their participation in a special use hearing. Should the village administer its zoning ordinance in a unreasonable, arbitrary, or discriminatory manner in denying the park district a special use permit or otherwise abuse its zoning

power to thwart or frustrate the park district's statutory duties, its actions will be subject to further judicial review." 112 Ill. 2d at 18-19, 490 N.E.2d at 1287.

Section 9 of the Act, at issue here, contains precisely what the supreme court in *Wilmette Park District* found lacking in the Park District Code and the Municipal Code in reaching its conclusion: an express exclusion of City power to regulate to the extent that such powers are granted to the Commission in section 8. Therefore, the outcome in that decision is not controlling in the present case.

Nevertheless, the legal principles articulated in *Wilmette Park District* lend guidance here. The City's decision to reissue the permit to counterdefendants without the Commission's approval is precisely the sort of "unreasonable, arbitrary [and] discriminatory" administration of its zoning ordinance that the supreme court condemned in *Wilmette Park District.* Granting the City sole land use authority within the District would clearly "thwart or frustrate" the Commission's statutory duty to "prohibit the use of buildings and structures incompatible with the character of the District."

Counterdefendants, on the other hand, maintain that because Carlton is a black-owned business, the Commission's denial of their permit is subject to challenge under *Wilmette Park District* as an "arbitrary, discriminatory and racially motivated" action. We note that the trial court, in granting the Commission's motion for a preliminary injunction, did not pass upon this issue because counterdefendants failed to seek administrative review of hearing officer O'Brien's finding that the proposed restaurant did not constitute a "medical or related" use as required under PUD 30, clearly a nondiscriminatory reason for the Commission's rejecting counterdefendants' permit. Thus, by not seeking review of that decision, counterdefendants have abandoned any racial claim. Nevertheless, they have raised it in their brief on appeal, and given the serious nature of such a charge, we have considered it and concluded it is without merit.

As discussed earlier, the Commission's decision to prohibit the erection of a fast-food restaurant in the District was not an isolated action, but rather an application of a policy consistently applied over 20 years to other free-standing restaurant applicants, many of whom were white. The only restaurants presently existing in the District are either integral parts of medical facilities or preexisted the establishment of the District, and therefore are permitted under section 8 of the Act. Moreover, the unrefuted testimony of Raymond Bayster, Executive Director of the Commission, established that when counterdefendants' proposal was rejected by the Commission in February

1982, the Commission was unaware of the race of anyone involved other than the owner of the property, Joseph Davis, who was known by Bayster to be white.

Despite the Commission's compelling evidence of a nondiscriminatory motive, counterdefendants contend that the lack of black-owned businesses in the District, and Bayster's alleged statement to counterdefendants' representatives that "certain people" were opposed to the establishment of a fast-food restaurant at that location and that "there might be some opportunity for resolution," gave counterdefendants the "distinct impression" that their race was a factor in the Commission's decision to deny their permit. First, it is unclear from the record whether there are in fact no black-owned businesses in the District. The source of that information, Mr. Robert Aulston vice-president of "Peter Carlton Enterprises," testified that he merely "observed the businesses by visiting them," apparently without determining actual ownership. But even if the allegation were true, we believe it is not indicative of any racial discrimination in this instance. Further, Bayster's alleged statement is hardly sufficient to establish a *prima facie* case of racial discrimination, especially where counterdefendants' counsel stipulated in court that Bayster was not motivated by racial animus.

■ Counterdefendants next maintain that injunctive relief is inappropriate since the Commission's condemnation powers afford the Commission an adequate remedy at law. (Ill. Rev. Stat. 1985, ch. 111½, par. 5004.) Specifically, they contend that in the event that a medical use for the property should emerge, the Commission could acquire the property through exercise of its eminent domain power. While the Act does allow for such an acquisition by the Commission, it also permits the Commission to "institute any appropriate action to prevent or abate any unlawful act within the district." (Ill. Rev. Stat. 1985, ch. 111½, par. 5018.) Given its determination that a fast-food restaurant is "incompatible with the character of the District" (Ill. Rev. Stat. 1985, ch. 111½, par. 5018), the Commission may properly enjoin the issuance of a building permit to counterdefendants pursuant to section 8. The fact that the Commission has not yet acquired the property for its own use does not destroy its right to injunctive relief, particularly where the Commission is contemplating several medical uses for the property.

■ Relying primarily on *First English Evangelical Lutheran Church v. County of Los Angeles* (1987), 482 U.S. 304, 96 L. Ed. 2d 250, 107 S. Ct. 2378, counterdefendants assert that the Commission's zoning of the Ogden and Oakley site constitutes a "taking" for which

they must receive just compensation under the fifth amendment. This proposition was not raised below, and in fact, was expressly disclaimed by counterdefendants' counsel at trial. While counterdefendants state in their brief that $30,000 to $40,000 has been spent on construction of the restaurant, there is no citation to the record to support this statement as well as no evidence as to fair compensation for the alleged deprivation. In any event, such evidence would be unpersuasive since it is undisputed that Carlton entered into the lease knowing that the property was restricted in use. (*Lapkus Builders, Inc. v. City of Chicago* (1964), 30 Ill. 2d 304, 196 N.E.2d 682.) Furthermore, *First English Evangelical* is inapplicable here where counterdefendants retain the right to put the land in question to other uses. See *Bello v. Walker* (3d Cir. 1988), 840 F.2d 1124.

■ Finally, counterdefendants maintain that there is "too much discretion" vested in Raymond Bayster of the Commission. For example, they claim that Bayster alone made the decision to deny counterdefendants' building permit, to expand another fast-food restaurant in the District, and to allow a secondhand store and auto repair shop to operate in the District. Concerning the building permit, Bayster testified that he and the Commission's president, Park Livingston, jointly wrote the letter rejecting counterdefendants' permit, and such rejection was based on a long-standing policy that free-standing restaurants would not be permitted in areas zoned for "medical and related" uses. Moreover, the decisions as to the other businesses mentioned above were either based on section 8 of the Act, which permits nonconforming uses in the District that were in existence prior to the District's creation, or section 6.4—6 of the Chicago Zoning Ordinance, which allows for expansion of use in nonconforming buildings (Chicago Municipal Code art. VI, ch. 194A, par. 6.4—6 (1988)).

As additional support for their position that Bayster had excessive discretion, counterdefendants cite Bayster's testimony that he would deny an application to build a house in the District, a permitted use of the land under PUD 30, and Judge James Murray's comment at the December 17, 1985, proceeding about the lack of standards in determining appropriate uses within the District. With respect to Bayster, we believe that counterdefendants mischaracterize his testimony. Bayster did not testify that he would deny an application to build a house as counterdefendants contend but, rather, stated that he was uncertain as to whether a house was permissible because the matter had never been brought before the Commission. Regarding Judge Mur-

ray's statements on December 17, the record reveals that he was merely asking rhetorical questions of counsel, not because he had determined the issues, but because he wished to elicit pertinent discussion. Accordingly, his remarks do not reflect findings which would bind this court.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'CONNOR and MANNING, JJ., concur.